**NARRAGANSETT INDIAN TRIBE OF RHODE ISLAND, Plaintiff,**

**v.**

**The State of RHODE ISLAND and Providence Plantations; Governor Donald L. Carcieri, State of Rhode Island, in his official capacity; Patrick C. Lynch, Rhode Island Attorney General, in his official capacity;**

Rhode Island State Police; Colonel Steven M. Pare, in his official capacity; Justices of The Rhode Island District and Superior Courts; Town of Charlestown; and Charlestown Police Department, Defendants.

State of Rhode Island, by and through the Attorney General, Patrick C. Lynch, Plaintiffs,

v.

Narragansett Indian Tribe of Rhode Island also Known as the Narragansett Tribe of Indians and Does 1 through 100, Defendants.

No. C.A. 03–296S.

United States District Court, D. Rhode Island.

Dec. 29, 2003.

John F. Killoy, Esq., Wakefield, RI, Douglas J. Luckerman, Esq., Lexington, MA, for Narragansett Indians.

Neil F.X. Kelly, Esq., Providence, RI, for State of Rhode Island; Patrick C. Lynch, in his capacity as Attorney General; Steven M. Pare, in his capacity as Colonel of the Rhode Island State Police; Justices of the Rhode Island District and Superior Courts.

Andrew M. Hodgkin, Esq., Claire J.V. Richards, Esq., Providence, RI, for Donald L. Carcieri, in his capacity as Governor of the State of Rhode Island.

Joseph S. Larisa, Jr., Esq., Providence, RI, for Town of Charlestown and Charlestown Police Department.

Gavin Clarkson, Esq., University of Michigan, Ann Arbor, MI, for Gavin Clarkson, Amicus Curiae.

Lynette J. Labinger, Esq., Roney & Labinger, Providence, RI, for Rhode Island Affiliate, American Civil Liberties Union, Inc., Interested Party.

Marilyn J. Ward Ford, Esq., Quinnipiac University School of Law, Hamden, CT, for New York Brothertown Indian Nation, Interested Party.

## DECISION AND ORDER

SMITH, District Judge.

The oftentimes tumultuous relationship between the State of Rhode Island

("State") and the Narragansett Indian Tribe of Rhode Island ("Tribe" or "Narragansetts") brings the parties once again to court; the matter in dispute is whether the Tribe may operate a "smoke shop" on its settlement lands unfettered by the State's cigarette tax laws.

Before the Court are the parties' cross-motions for summary judgment in their respective actions for declaratory judgment. The Court concludes that the State properly may impose its tax on cigarettes sold at the tribal smoke shop located on the settlement lands, and may enforce the law's criminal provisions against non-compliance that occurs on the settlement lands. This conclusion is driven by the finding that the legal incidence of the State's cigarette tax scheme falls on the purchaser or consumer of cigarettes, and not on the Tribe. Under the State's cigarette tax scheme, the Tribe (like other retail sellers of cigarettes) acts merely as an agent for the collection of the tax. It is appropriate for the State to impose this burden on the Tribe; and such a burden does not amount to taxation of the Tribe, nor does it violate the Tribe's sovereign rights. Consequently, the Tribe must comply with Rhode Island's applicable tax laws if it wishes to continue to sell cigarette products on the settlement lands. Further, for the reasons discussed in greater detail below, because the legal incidence of the tax scheme falls on the consumer, this Court must decline to reach the question of whether the State may impose the cigarette tax scheme (or any other direct tax) directly on the Tribe. And finally, this Court finds that the State did not violate federal law nor the Tribe's sovereign rights when it enforced the criminal provisions of the State's cigarette tax scheme by executing a search warrant on the settlement lands.

## I. Background

### A. The Posture of the Case

The Tribe is a federally recognized Indian tribe,[1] see Final Determination for Federal Acknowledgment of Narragansett Indian Tribe of Rhode Island, 48 Fed.Reg. 6177–05 (Feb. 10, 1983), residing on Settlement Lands[2] located within the Town of Charlestown, Rhode Island. On July 12, 2003, the Tribe opened a smoke shop (the "Smoke Shop" or "Shop") on the Settlement Lands for the purpose of producing income for the Tribe. See Joint Stipulations ("Stips.")[3] ¶¶ 5, 7.

1. Federal recognition confers certain status and privileges on a tribe:

 Upon final determination that the petitioner exists as an Indian tribe, it shall be considered eligible for the services and benefits from the Federal government that are available to other federally recognized tribes. The newly acknowledged tribe shall be considered a historic tribe and shall be entitled to the privileges and immunities available to other federally recognized historic tribes by virtue of their government-to-government relationship with the United States. It shall also have the responsibilities and obligations of such tribes. Newly acknowledged Indian tribes shall likewise be subject to the same authority of Congress and the United States as are other federally acknowledged tribes.
 25 C.F.R. § 83.12(a).

2. As set forth in detail at p. 161, infra, the term "Settlement Lands" refers to approximately 1,800 acres of land acquired by the Tribe in exchange for the Tribe's settlement of claims that were pending in the United States District Court for the District of Rhode Island in the late 1970s. See 25 U.S.C. § 1702(f). They do not include other land acquired by the Tribe. (For simplicity, the Settlement Lands are sometimes referred to herein as "tribal lands.")

3. In order to expedite consideration of the case by this Court, the parties have agreed to

In general, retailers and distributors of cigarettes must comply with a number of statutory requirements relating to traffic in cigarettes, including provisions governing taxation. *See* R.I. Gen. Laws § 44–20–1, *et seq.;* p. 163, *infra.* Furthermore, Rhode Island law requires cigarette retailers to obtain several permits and licenses, including a retail sales tax permit pursuant to R.I. Gen. Laws § 44–19–1 and a Sunday sales permit from the pertinent municipality in accordance with R.I. Gen. Laws § 5–23–2. Presumably to increase the profitability of the Shop and distinguish itself from other retailers of cigarettes, and believing that the State did not possess the legal authority to enforce its cigarette tax and licensing requirements on it, the Tribe chose not to comply with these laws. *See* Stips. ¶ 8.

For an unspecified period of time prior to the opening of the Shop, the Tribe imported unstamped cigarettes onto its lands from other states in anticipation of the Shop's grand opening. *See* Stips. ¶ 4. When the Shop opened, the Tribe offered unstamped and untaxed cigarettes to the general, retail public at prices substantially lower than the minimum established by State law. *See* Stips. ¶ 7. The Tribe also did not collect Rhode Island's 7% retail sales tax from customers purchasing cigarettes at the Smoke Shop. *See id.* Although some of the cigarettes were being sold to tribal members, a large proportion of the Shop's customers were not members of the Tribe. *See id.*

Believing that the operation of the Smoke Shop violated this myriad of laws (and specifically R.I. Gen. Laws §§ 44–20–35, 36, 37 and 38, which make it a misdemeanor criminal offense to sell unstamped cigarettes, and allow the seizure of such cigarettes as contraband), on July 14, 2003, the Rhode Island State Police executed a search warrant at the Shop and confiscated the Tribe's inventory of unstamped cigarettes. *See* Stips. ¶ 9. During the execution of the search warrant, an altercation occurred between some members of the Tribe and several State police officers. *See* Stips. ¶ 10. Eight tribal members, including the Chief Sachem of the Tribe, were arrested following the melée. *See id.*

In the wake of the police raid, both the State and the Tribe brought the dispute to court. On July 15, 2003, the Tribe brought the first action in this Court, seeking a declaratory judgment against the State, the Governor and Attorney General of Rhode Island in their official capacities, the Rhode Island State Police, Colonel Steven Pare of the Rhode Island State Police in his official capacity, the Justices of the Superior and District Courts of the State of Rhode Island (in their official capacities),[4] the Town of Charlestown, and the Charlestown Police Department. (For simplicity's sake, these Defendants are collectively referred to herein as "Defendants" or "the State".) The Tribe's Complaint sets forth allegations that the Tribe's status under the Rhode Island Indian Claims Settlement Act ("Settlement Act"), 25 U.S.C. § 1701, *et seq.,* and its sovereign immunity as a federally recognized Indian tribe preclude the State and its officials from enforcing the State's cigarette sales and excise tax scheme with respect to tribal activities occurring on the Settlement Lands. The Tribe also filed a Motion for a Temporary Restraining Order in an effort to reopen the Smoke Shop pending the resolution of the case.

and filed joint stipulations of fact. *See* p. 159, *infra.*

**4.** It is questionable whether the Justices of the Superior and District Courts of Rhode Island are properly named Defendants. However, neither party has addressed this issue, and in light of the Court's holding, there seems to be little reason to do so at this stage of the proceedings.

On July 17, 2003, the State brought a separate declaratory judgment action in Rhode Island State Superior Court seeking a declaration that the Tribe's failure to comply with State excise, retail, and sales taxes is unlawful. The State also moved for a temporary restraining order to prevent the Tribe from selling cigarettes on its Settlement Lands without complying with Rhode Island's sales and excise tax laws. Later that same day, the Tribe removed the state court action to this Court, purportedly pursuant to 28 U.S.C. § 1441(b). The State did not object to this procedural maneuver. After conferring with counsel in chambers on the parties' respective Motions for Temporary Restraining Orders, the parties represented to the Court that the essential facts were not in dispute. They agreed, therefore, to file stipulated facts and cross-motions for summary judgment on an expedited schedule. Further, the parties agreed that the Smoke Shop would remain closed pending the resolution of the issues in the case, thereby mooting the requests for Temporary Restraining Orders.

On July 18, 2003, the Court consolidated the actions pursuant to Federal Rule of Civil Procedure 42(a). Thereafter, the Court consolidated the parties' Motions for Preliminary Injunctive Relief with the trial of the action on the merits, and, with the agreement of the parties, the Court established an expedited schedule. On July 30, 2003, the parties submitted factual stipulations and on August 20, 2003, they filed their cross-motions for summary judgment. The Court heard oral argument on September 23, 2003.

B. *Jurisdiction*

■ Although these cases have been consolidated pursuant to Fed.R.Civ.P. 42(a), the actions remain separate and this writer must first determine whether this Court has subject matter jurisdiction over each case independent of the other. The Court's subject matter jurisdiction in one case does not automatically confer it in the other.

Subject matter jurisdiction clearly exists in the action originally filed by the Tribe in this Court. *See* 28 U.S.C. § 1362 (which provides that "United States District Courts shall have original jurisdiction over all civil actions, *brought* by an Indian tribe ... wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.") (emphasis added).

■ Jurisdiction over the State's suit, which was removed to this Court, is another matter. This Court may exercise subject matter jurisdiction as to that action only if the State could have brought it in this Court originally. 28 U.S.C. § 1441(b). Under the "well pleaded complaint" rule, the federal question upon which subject matter jurisdiction is premised must be ascertainable on the face of the plaintiff's complaint. *See Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998); *Delta Dental of Rhode Island v. Blue Cross & Blue Shield of Rhode Island*, 942 F.Supp. 740, 747 (D.R.I.1996). The federal question must be presented by the plaintiff in the complaint, and cannot arise merely as a defense to the plaintiff's allegations. *See Rivet*, 522 U.S. at 475, 118 S.Ct. 921 ("A defense is not part of a plaintiff's properly pleaded statement of his or her claim."); *Delta Dental*, 942 F.Supp. at 747 ("An action arising under state law cannot be removed solely because a federal right or immunity can be raised as a defense.").

The State brought its action under Rhode Island's Uniform Declaratory Judgments Act, R.I. Gen. Laws § 9–30–1, *et seq.,* seeking a declaration that the Tribe's failure to comply with Rhode Island's cigarette sales and excise tax scheme was unlawful. The State's Complaint did not

mention the Settlement Act, nor did it assert any other claim grounded in federal law. In its removal papers filed with this Court, the Tribe cited the Settlement Act, 28 U.S.C. § 1362, and two federal cases as grounds for this Court's jurisdiction over the removed action, and the State did nothing to oppose the removal.

■■■ The parties' cooperative effort to consolidate their cases in one court is admirable, but mutual desire and convenience is plainly insufficient to confer subject matter jurisdiction. First, the Settlement Act cannot be a basis for subject matter jurisdiction over the State's action because the State did not bring its claims under the Settlement Act. In referring this Court to the Settlement Act, the Tribe essentially argues that the Court can maintain jurisdiction over the State's Complaint because the Tribe would raise the Settlement Act as a defense to the State's declaratory judgment action. As discussed above, the invocation of a federal statute as a defense is simply not, by itself, a viable basis for jurisdiction. Second, 28 U.S.C. § 1362 only vests jurisdiction in a federal court over actions *brought* by an Indian tribe under the laws of the United States. Since the State could not have brought an action in federal court under section 1362, the Tribe cannot properly rely on it to remove the State's Complaint to this Court.

Third, the cases cited by the Tribe in support of removal are unavailing and inapposite. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) is frequently cited for the proposition that federal law preempts state law in ERISA cases, but it has nothing to do with the asserted grounds for the Tribe's removal here. *Penobscot Nation v. Georgia–Pacific Corp.*, 106 F.Supp.2d 81 (D.Me.2000) involved an application of the well pleaded complaint rule; there, however, jurisdiction over an Indian tribe's challenge to Maine's Freedom of Information Act was *refused*.

Therefore, because this Court has no basis for exercising subject matter jurisdiction over the State's Complaint, that action is dismissed and remanded to state court.[5]

### C. *The History of the Narragansett Tribe and its Relationship with the State of Rhode Island*

Some historical context regarding the parties' relationship is helpful in understanding and deciding the questions presented. A slightly more than thumbnail discussion of this relationship follows.

The Narragansetts and the Puritan colonists of what is now Rhode Island peacefully coexisted from the time of the colonists' arrival until the end of the 17th century when the Tribe was drawn into King Philip's War. *See Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335, 1336 (D.C.Cir.1998) (citing William G. McLoughlin, *Rhode Island* 4–5, 9–10 (1978)).[6] As a result of the war, the Tribe was decimated and its remaining members settled on land in what is now Charlestown, Rhode Island. *See id.* In 1880, after nearly one hundred years of resistance, the Narragansetts agreed to sell all but two of their acres in Charlestown for the sum of $5,000. *See id.*

---

**5.** As a practical matter, this ruling will likely have no effect on the Court's ability to address the issues necessary to resolve this case. The Court will treat the State's Motion for Summary Judgment in the State's case as a motion for summary judgment in the Tribe's action.

**6.** King Philip's War was waged in 1675 between the British government and various Native American tribes. At the time of the war, Metacomet, Massasoit's son, was Chief of the Wampanoags and had been friendly with the British. The British referred to Metacomet as "Philip," after Philip of Macedon.

For nearly a century, all was quiet. Then, early in 1978, the Tribe filed two complaints in this Court that rocked the State (and particularly the residents of Charlestown), alleging its entitlement to the possession of approximately 3,200 acres of land in Charlestown. The Tribe claimed that it owned this land as part of its historical aboriginal territory, and that the State had improperly alienated the Tribe from the land in 1880 in violation of the Indian Nonintercourse Act, 25 U.S.C. § 177.[7] The Tribe contended that the alienation of the lands violated the Nonintercourse Act because the transfer was never approved by the federal government. The Tribe argued that its aboriginal title to these lands was never extinguished and was therefore superior to any title held by any landowner who acquired land subsequent to the transfers in 1880.

The filing of these suits clouded the titles of hundreds of landowners in Charlestown. To clear up this murky state of affairs, and resolve the land dispute, the Narragansetts, Charlestown, and the State settled the lawsuits and memorialized their agreement in a Joint Memorandum of Understanding ("JMOU") on February 28, 1978. *See* 25 U.S.C. §§ 1701(c), 1702(h). The JMOU, among other things, provided for the following: (1) the State would enact legislation creating a state-chartered, Indian-controlled corporation with an irrevocable charter for the purpose of permanently holding and managing the Settlement Lands in trust for the Narragansetts; (2) the Settlement Lands would include approximately 900 acres of privately held land (to be purchased with a federal appropriation) and approximately 900 acres of state owned land (to be transferred by the State); (3) the Settlement Lands would be subject to a special federal restraint against alienation and would be exempt from federal, state, and local taxation; the Town would instead receive "in lieu" payments for governmental services provided by the Town with respect to the land; (4) all laws of the State would continue in full force and effect on the Settlement Lands, but the Indian-controlled corporation would be given authority to establish its own hunting and fishing regulations on the Settlement Lands; and (5) the Narragansetts would agree to dismiss with prejudice their complaint against the State, and agree to the extinguishment of all Indian land claims in Rhode Island. JMOU (reprinted at H. Rep. No. 1453, 95th Cong., 2d Sess. 6 (1978), U.S.Code Cong. & Admin.News 1978, p. 1948); *Town of Charlestown v. United States,* 696 F.Supp. 800, 802–03 (D.R.I.1988).

Because Congress has plenary power over Indian matters, the settlement agreement was meaningless unless it was passed into law by an act of Congress. *See Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 689 (1st Cir.1994) (*"Narragansett Indian Tribe"*) (citing *Morton v. Mancari,* 417 U.S. 535, 551–52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). At the be-

---

7. The Indian Nonintercourse Act was enacted not long after the founding of the nation, at a time when the relationship between the newly formed government of the United States and the various Native American tribes inhabiting the land was in its infancy. The act embodies the policy of the United States to acknowledge and guarantee the Indian tribes' right of occupancy of tribal lands and to prevent the tribes from disposing of their land improvidently. *Narragansett Tribe of Indians v. Southern Rhode Island Land Dev. Corp.,* 418 F.Supp. 798, 803 (D.R.I.1976).

> The act provides, in pertinent part, that:
> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177.

hest of the State's congressional delegation, Congress enacted the Settlement Act, which in large measure tracks the substance and structure of the JMOU. *See id.*

The Settlement Act established a fund with an initial appropriation of $3,500,000 for the purchase of the privately owned lands that were to comprise half of the Settlement Lands. *See* 25 U.S.C. §§ 1703–07, 1710. To facilitate the purchase and transfer of these land tracts, the Settlement Act called for the creation of a state-chartered corporation by the State of Rhode Island ("State Corporation"). *See* 25 U.S.C. §§ 1705–07. Consistent with the JMOU, the Settlement Act further provided that the land transferred to the State Corporation would not "be subject to any form of Federal, State, or local taxation . . . ." 25 U.S.C. § 1715(a).

The final link in the settlement chain was passed by the Rhode Island General Assembly on May 4, 1979. As required by the Settlement Act, the General Assembly enacted the Narragansett Indian Land Management Corporation Act (the "State Act"), Pub.L. No.1979, ch. 116, 1979 R.I. Pub. Laws 402, which "authorized, created and established a permanent, public corporation of the state having a distinct legal existence from the state and not constituting a department of state government[.]" R.I. Gen. Laws § 37–18–3. Like the Settlement Act, the State Act exempted the Settlement Lands from taxation and assessment.[8]

Although the State Corporation was apparently intended to be permanent, in

1985, the Rhode Island General Assembly amended the State Act by providing an expiration date for the State Corporation and for the transfer of the Settlement Lands from the State Corporation to the Narragansetts. *See* R.I. Gen. Laws §§ 37–18–12, 37–18–13. These amendments were contingent upon the Narragansetts obtaining federal recognition as an Indian tribe pursuant to 25 U.S.C. § 1707 and 25 C.F.R. § 83. Once the Tribe attained this status, the State Corporation would cease to exist and the Settlement Lands would be transferred to the Narragansetts. *See* R.I. Gen. Laws § 37–18–13. On February 2, 1983, the federal government recognized the Narragansetts as an Indian tribe. *See* 48 Fed.Reg. 6177–78 (Feb. 2, 1983). Pursuant to the amendments to the State Act, the Settlement Lands were then transferred to the Narragansetts. While the State Act, like the Settlement Act, recognized that the Narragansetts were not required to pay any taxes or assessments on the Settlement Lands, the State Act also provided that the State Corporation was subject to all of the criminal and civil laws of the State. *See* R.I. Gen. Laws §§ 37–18–9, 37–18–11. In 1988, the Settlement Lands changed hands for the last time when the Narragansetts deeded the Settlement Lands to the Bureau of Indian Affairs ("BIA") to be held in trust for the Tribe. *See Narragansett Indian Tribe*, 19 F.3d at 689. The deed transferring the Settlement Lands to the BIA expressly recognized the applicability of state laws conferred by the Settlement Act.[9] As things presently stand, the

---

8. The State Act provided, in pertinent part, that:

> [t]he [State] corporation shall make payments in lieu of real property taxes and assessments to the town with respect to income producing projects of the corporation located in the town, and for police, fire, sanitation, health protection and municipal services provided by the town to the

real estate held by the corporation in the town. The payments in lieu of taxes shall be in such amounts as shall be agreed upon by the corporation and the town.

R.I. Gen. Laws § 37–18–9(b).

9. On September 4, 2003, after the commencement of this litigation, the Tribe filed a new deed with the BIA. The new deed eliminates this language. The State has initiated an ac-

Settlement Lands remain in the hands of the BIA, in trust for the Tribe.

## II. *Summary Judgment Standard*

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). The Court must "view all facts and draw inferences in the light most favorable to the nonmoving party." *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir.1997) (citing *Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991)). As discussed above, the relevant facts in this case, as presented in the parties' stipulations, are well known and not in dispute. The matter is therefore ripe for summary judgment.

## III. *Analysis*

### A. *Rhode Island's Cigarette Tax Scheme*

Every person engaged in the sale of cigarettes in Rhode Island must first obtain a license from the State Tax Administrator. R.I. Gen. Laws § 44–20–2. In addition to this licensing requirement, Rhode Island imposes an excise tax on cigarettes sold, distributed, held, or consumed within its borders. R.I. Gen. Laws § 44–20–12. The tax is collected through the sale of cigarette stamps, which must be affixed to all packages of cigarettes possessed within the State (with limited exceptions). R.I. Gen. Laws §§ 44–20–13, 44–20–18, 44–20–30. State law also requires a retailer to add a sales tax to the sale price of the cigarettes. R.I. Gen. Laws § 44–18–19.

The excise tax imposes obligations on distributors, dealers,[10] and consumers. Distributors must affix tax stamps in the proper denominations at the location where their license is issued. The stamps may be affixed to a distributor's cigarettes at any time before transferring the possession of the cigarettes. R.I. Gen. Laws § 44–20–28. When a dealer receives unstamped cigarettes, he or she must affix stamps within twenty-four hours after coming into possession of the cigarettes. R.I. Gen. Laws § 44–20–29. Furthermore, the State, with the assistance of the federal government, has developed a method to collect the excise tax from consumers who reside in Rhode Island but purchase cigarettes from a dealer outside of the State.[11] Finally, State law makes it unlawful to sell or possess unstamped cigarettes, *see* R.I. Gen. Laws §§ 44–20–35, 44–20–36, and cigarettes not bearing stamps that are not exempt are contraband and subject to seizure by the State. R.I. Gen. Laws §§ 44–20–37, 44–20–38.[12]

---

tion in this Court against the BIA to prevent the acceptance of the new deed. *See Carcieri, et al. v. Norton, et al.*, C.A. No. 03–469S (D.R.I. filed Oct. 8, 2003). No action has yet been taken in that case.

**10.** A dealer "means any person other than a distributor who is engaged in [Rhode Island] in the business of selling cigarettes." R.I. Gen. Laws § 44–20–1(3).

**11.** The Jenkins Act, 15 U.S.C. § 375, *et seq.*, was designed to assist states in collecting cigarette sales taxes on cigarettes sold through

mail order or over the Internet. Under that act, persons who ship cigarettes into Rhode Island that do not bear the requisite tax stamp are required to provide Rhode Island's State Tax Administrator with a periodic report of their customers. Upon receipt of the report, the state will send tax bills to the customer informing him or her of their obligation to pay the requisite tax under Rhode Island law.

**12.** For simplicity, the Court will refer to the complex of cigarette tax statutes described above as the "Cigarette Tax" or "Cigarette Tax Scheme."

## B. *Where Does the Legal Incidence of the Cigarette Tax Fall?*

■ The legality of Rhode Island's imposition of the Cigarette Tax on the sale of cigarettes by the Tribe depends altogether on a determination of who bears the legal incidence of the Cigarette Tax. If, as the State contends, the incidence of the Cigarette Tax ultimately falls on consumers (*i.e.,* those who patronize the Smoke Shop as purchasers of cigarettes), that disposes of the case, as the State cannot be barred from enforcing the Cigarette Tax by virtue of the Tribe's sovereign status. However, if, as argued by the Tribe, the legal incidence of the Cigarette Tax rests on the Tribe or its members, as dealers of cigarettes, the Cigarette Tax cannot be enforced absent clear congressional authorization which, the Tribe claims, is absent. *See Oklahoma Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 459, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (citing *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation,* 425 U.S. 463, 475–81, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976)); *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation,* 502 U.S. 251, 258, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992).

■ To answer the question of where the legal incidence of the tax falls, the Court begins by examining the pertinent language of the statute in question. The Supreme Court has held that the applicable taxing statute must be given "a fair interpretation ... as written and applied...." *Cal. State Bd. of Equalization v. Chemehuevi Indian Tribe,* 474 U.S. 9, 11, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985) (per curiam); *see Chickasaw,* 515 U.S. at 461, 115 S.Ct. 2214. Rhode Island law is explicit: "[a]ll taxes paid in pursuance of [the

Cigarette Tax] are conclusively presumed to be a direct tax on the retail consumer, precollected for the purpose of convenience and facility only." R.I. Gen. Laws § 44–20–53.[13] In other words, the retailer pays the Cigarette Tax to the wholesaler or distributor and then adds it to the price paid by the ultimate purchaser of the cigarettes.

The State contends that a literal reading of Rhode Island's Cigarette Tax Scheme makes plain that the legislature intended to place the legal incidence of the Cigarette Tax on the consumer. The State relies on a raft of United States Supreme Court decisions uniformly holding that the legal incidence of taxes of this stirp falls on the consumer. The Tribe rejoins that while Rhode Island law creates a "legal presumption" that the incidence of the tax falls on the consumer, "the operational legal incidence of the tax falls squarely on the Tribe." Pl. S.J. Mem. at 47.

The Tribe's argument misses the mark. As the State points out, the Supreme Court has upheld the imposition of various state tax laws pertaining to the sale of cigarettes on Indian land. *See, e.g., Dept. of Taxation and Fin. of New York v. Milhelm Attea & Bros., Inc.,* 512 U.S. 61, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994); *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Moe,* 425 U.S. 463, 96 S.Ct. 1634. These cases have soundly rejected the argument made by the Tribe that the pass through provision places the "operational" legal incidence on Tribe, and therefore amounts to a tax on the Tribe itself.

For example, in *Moe,* the Supreme Court considered a state taxing scheme

---

**13.** Provisions of this type have been referred to as "pass through" provisions, in that the language of the statute requires distributors and retailers to pass on the tax to consumers via the price of the product. *See Chickasaw,* 515 U.S. at 461, 115 S.Ct. 2214; *Moe,* 425 U.S. at 482, 96 S.Ct. 1634.

very similar to Rhode Island's. The Confederated Salish & Kootenai Indian Tribes brought an action seeking declaratory and injunctive relief against Montana's cigarette licensing statute as applied to tribal members selling cigarettes on reservation land. Under Montana's cigarette licensing statute, a seller of cigarettes was required to precollect taxes on cigarettes sold at retail by adding the tax to the sale price of the cigarettes. The tribes argued that the procedure made "the Indian retailer an 'involuntary agent' for collection of taxes owed by non-Indians" and was therefore "a 'gross interference with [their] freedom from state regulation....'" *Id.* at 482, 96 S.Ct. 1634 (citing *Warren Trading Post v. Arizona State Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965)). The tribes further contended that forcing them to collect the cigarette tax on sales by Indians to non-Indians amounted to a tax on the tribes. *See id.* at 481, 96 S.Ct. 1634.

Looking to the language of the statute, which provided that the tax "shall be conclusively presumed to be [a] direct [tax] on the retail consumer precollected for the purpose of convenience and facility only," (quoting Mont. Rev.Code Ann. § 84–5606(1) (1947)), the Court agreed with the lower court's conclusion that "it is the non-Indian consumer or user who saves the tax and reaps the benefit of the tax exemption." *Id.* at 482, 96 S.Ct. 1634. The Court found that the purpose of the tax scheme was to reduce the chance that non-Indian purchasers would purchase unstamped cigarettes without later submitting the appropriate tax. The Court reasoned that Montana's

> requirement that the Indian tribal seller collect a tax validly imposed on non-Indians is a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax.

*Id.* at 483, 96 S.Ct. 1634. Therefore, "to the extent that the 'smoke shops' sell to those upon whom the State has validly imposed a sales or excise tax ... the State may require the Indian proprietor simply to add the tax to the sales price[.]" *Id.* at 483, 96 S.Ct. 1634.

Since *Moe,* the Supreme Court has continued to affirm that cigarette tax schemes containing pass through provisions place the legal incidence of the tax on the consumer. *See Chickasaw,* 515 U.S. at 461, 115 S.Ct. 2214 (pass through provisions are dispositive when determining who bears a tax's legal incidence); *Milhelm Attea,* 512 U.S. at 64, 114 S.Ct. 2028 (upholding cigarette tax scheme that provides that "the ultimate incidence of and liability for the tax [is] upon the consumer"). Indeed, the Supreme Court has upheld numerous cigarette tax schemes even without pass through language that explicitly states that the consumer bears the legal incidence of the tax. *See Chemehuevi,* 474 U.S. at 11, 106 S.Ct. 289 (holding that an express pass through statement is not necessary before an Indian tribe may be required to collect cigarette taxes); *Colville,* 447 U.S. at 159, 100 S.Ct. 2069 (holding that the legal incidence of a cigarette tax fell on the consumer, and not the Indian tribe, because the consumer's purchase of the cigarettes was the first taxable event in the chain of distribution).

The Tribe attempts to circumvent this formidable line of Supreme Court authority with a decision of the Rhode Island Supreme Court—*Daniels Tobacco Co., Inc. v. Norberg,* 114 R.I. 502, 335 A.2d 636 (1975). *Daniels* involved an attempt by the Rhode Island State Tax Administrator to assess $21,733.16 in taxes on cigarettes and tobacco products that had been stolen prior to the assessment. At an administrative hearing, the taxpayer, a distributor, submitted evidence that seventy percent of the cigarettes upon which taxes were as-

sessed were destined for out-of-state sale. The Administrator ruled against the taxpayer, and ordered full payment of the taxes due. The taxpayer appealed to the Superior Court, which reversed the decision of the Administrator and ordered a refund to the taxpayer in the amount of $15,321.88. The Superior Court held that the Rhode Island Cigarette Tax Scheme imposed a tax only on cigarettes sold in Rhode Island, or held for sale in Rhode Island. Accordingly, a tax could only be imposed on the quantity of cigarettes that was being held for sale in Rhode Island.

On appeal, the taxpayer contended that he was entitled to a refund of the tax assessed on cigarettes held for sale in Rhode Island because they had been stolen before they were shipped or delivered to customers in Rhode Island. *Id.* at 505, 335 A.2d 636. The taxpayer argued that, under Rhode Island law, distributors are not liable for the imposition of the Cigarette Tax because the tax is actually a direct tax on the consumer. The Rhode Island Supreme Court disagreed, holding that the legal incidence of the tax falls on the distributor, not the consumer:

> The taxpayer overlooks § 44–20–28, which requires a distributor to affix tax stamps to all cigarettes he distributes. [T]he mere fact that the ultimate economic burden of a tax is on the consumer does not determine the legal incidence of the tax.

*Id.* at 506, 335 A.2d 636 (citing *Ferrara v. Director, Div. of Taxation,* 127 N.J.Super.

240, 317 A.2d 80 (1974)). The court concluded that the risk of loss of cigarettes lies with the distributor and not the state.

The Tribe contends that *Daniels* controls here, even in the face of the substantial Supreme Court authority to the contrary, because the Rhode Island Supreme Court is the final arbiter of Rhode Island law. The Tribe's argument is misguided for several reasons.

■ As an initial matter, this Court is not bound by the Rhode Island Supreme Court's reasoning in *Daniels*. Indeed, when the rights of sovereigns are implicated, this Court is *compelled* to look to federal law to determine where the legal incidence of a state tax falls. *See United States v. Mississippi Tax Comm'n,* 421 U.S. 599, 609 n. 7, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1975); *Kern–Limerick, Inc. v. Scurlock,* 347 U.S. 110, 121, 74 S.Ct. 403, 98 L.Ed. 546 (1954) (where the legal incidence of a tax falls is a question of federal law, otherwise "a state court might interpret its tax statute so as to throw tax liability where it chose, even though it arbitrarily eliminated an exempt sovereign").[14] Moreover, because *Daniels* predates *Moe,* the Rhode Island Supreme Court rendered its decision without the benefit of the Supreme Court's finding that pass through tax provisions are dispositive as to who bears the legal incidence of a tax. As such, the holding of *Daniels,* even if read as the Tribe would have it, is suspect and, in any event, unpersuasive in light of *Moe.*[15]

---

**14.** In fact, one case cited by the Tribe for the proposition that *Daniels* controls actually states just the opposite. *See Sac and Fox Nation of Missouri v. Pierce,* 213 F.3d 566, 578 (10th Cir.2000) ("For our purposes, the question of where the legal incidence of the Kansas motor fuel tax rests is one of federal law."). For this reason, the Tribe's reliance on *Coeur D'Alene Tribe v. Hammond,* 224 F.Supp.2d 1264, 1270 (D.Id.2002) does not assist it. In *Hammond,* the court improperly

relied on Idaho Supreme Court precedent to hold that the legal incidence of an Idaho fuel sales tax fell on Indian retailers, and not the consumer.

**15.** Furthermore, even if this Court were bound by *Daniels* (which it undoubtedly is not), its holding is ambiguous with regard to the legal incidence of Rhode Island's Cigarette Tax. *Daniels* did not explicitly hold that the legal incidence of the Cigarette Tax

In plain language, the pass through provision of Rhode Island's Cigarette Tax Scheme states that the legal incidence of the Cigarette Tax falls on the consumer. While the Supreme Court has held that a tax scheme does not need to contain such an express statement to place the legal incidence of a tax on the consumer, the Court has enforced such provisions when they are present. Rhode Island's Cigarette Tax Scheme is virtually identical to the pass through provision upheld by the Supreme Court in *Moe*, and under the holding of *Chickasaw* that is "dispositive". 515 U.S. at 461, 115 S.Ct. 2214. Moreover, the Tribe's argument that, notwithstanding section 44–20–53, it bears the "operational legal incidence" of the cigarette tax, simply cannot withstand this tidal wave of authority. The Supreme Court has stated repeatedly that a state may impose minimal burdens on retailers of cigarettes (specifically, Indian tribes) by using pass through language in order to ensure that a tax is collected, without changing the locus of the legal incidence. The minimal administrative burden of precollection simply does not overcome the force of state law placing the legal incidence on the consumer. This Court finds that the requirements that the Cigarette Tax Scheme places on the Tribe are no more burdensome than those previously upheld in *Moe, Colville, Milhelm Attea*, and their kindred cases.[16] Therefore, based upon the clear language of section 44–20–53, this Court holds that the legal incidence of Rhode Island's Cigarette Tax falls on the consumer.[17]

### C. *The Unanswered Questions*

The Court's determination that the legal incidence of the Cigarette Tax falls on the consumer, and not the Tribe, renders it unnecessary and inappropriate to decide two essentially identical questions contained in the Complaint and argued extensively by the parties; both questions involve the issue of whether, assuming that the legal incidence of the Cigarette Tax falls upon the Tribe, such a tax is lawful in light of the Tribe's sovereign status, and the requirement of unmistakably clear congressional authorization for a direct tax on the Tribe.[18] In the context of declaratory judgment actions, the First Circuit has urged district judges to exercise caution in deciding difficult constitutional questions. In *El Dia, Inc. v. Hernandez Colon,* 963 F.2d 488 (1st Cir.1992) the court admonished:

> Especially when matters of great public moment are involved, declaratory judgments should not be pronounced 'unless the need is clear, not remote or speculative.' ... [C]ourts should withhold declaratory relief as a matter of discretion if such redress is unlikely to palliate, or not needed to palliate, the fancied injury, especially when refraining from issu-

Scheme fell on the distributor (although this may well have been the court's intention); rather, the explicit holding in *Daniels* is that the sole fact that the final economic burden of the Cigarette Tax rests on the consumer is not dispositive when determining who bears the legal incidence of the tax. This says nothing about whether the pass through provision of the Cigarette Tax places the legal incidence of the tax on the consumer, or whether it falls on someone else—indeed, *Daniels* never explicitly addressed the pass through provision.

16. *See, e.g., Chickasaw,* 515 U.S. 450, 115 S.Ct. 2214; *Chemehuevi,* 474 U.S. 9, 106 S.Ct. 289.

17. The Complaint does not request a declaration about whether the State may impose its Cigarette Tax on either *Indian* or *tribal* consumers who purchase Smoke Shop products, and this Court makes no finding on that issue in this decision.

18. *See, e.g.,* Pl. S.J. Mem. at 15–44; Def. S.J. Mem. at 5–22; Pl. Reply Mem. at 6–39; Def. Mem. Opp. S.J. at 3–25.

ing a declaratory judgment 'avoid[s] the premature adjudication of constitutional issues.' ... [W]e believe that declaratory judgments concerning the constitutionality of government conduct will almost always be inappropriate when the constitutional issues are freighted with uncertainty and the underlying grievance can be remedied for the time being without gratuitous exploration of uncharted constitutional terrain.

*Id.* at 494 (citations omitted). Thus, although the Tribe seeks declarations both that "the [Tribe], within its inherent sovereign power and as a matter of federal law, has authority to sell cigarette products free from state laws upon Tribal lands," and that "the Settlement Act does not subject the Tribe to State taxation for the sale of cigarette products," Complaint at 8, ¶¶ a, b, this Court will not oblige. In order to analyze these questions, the Court would have to assume hypothetically that the legal incidence of the Cigarette Tax fell on the Tribe; all subsequent conclusions with respect to the Tribe's retained rights of sovereignty and the State's jurisdiction over the Settlement Lands would proceed on the basis of this conjecture. To issue gratuitous declarations on complex and untested constitutional questions, especially in the area of the authority of the State (via the Settlement Act) to impose a direct tax on the Tribe,[19] would almost certainly offend the call for judicial discretion announced in *El Dia.*

If this leaves the waters in a turbid state, that cannot be avoided. The nature of the State's jurisdictional power over the Settlement Lands and the contours of the Tribe's retained rights of sovereignty have long been and "remain[ ] ill-defined in cer-

tain respects." *Narragansett Indian Tribe,* 19 F.3d at 705. These and other questions will be tested in their own time.

D. *May the State Enter Onto the Settlement Lands to Enforce the Cigarette Tax Scheme Without Violating the Tribe's Retained Rights of Sovereignty?*

The Tribe also seeks declarations that the July 12, 2003 search warrant, and the arrests made in connection with its execution, be "vacated or otherwise held in violation of federal law and the Tribe's sovereign rights thereunder." Complaint at 8, ¶¶ c, d. This Court has held that the legal incidence of the Cigarette Tax Scheme falls on the consumers of Smoke Shop products, not on the Tribe. Therefore, the Tribe is obligated under the Cigarette Tax Scheme to purchase tax stamps for the cigarettes that it intends to sell at its Smoke Shop, or to purchase cigarettes for resale which already have stamps affixed. The refusal or failure of the Tribe to do so is a criminal offense, albeit a minor one. The question, then, is whether and to what extent may State law enforcement officers invade tribal lands to enforce this type of violation of State law. Asked another way, does the sovereign status of the Tribe and its land stand as a barrier to the enforcement of the criminal provisions of the Cigarette Tax Scheme.

The analysis of this question begins where the First Circuit left off in its informative discussion of the history and application of the Settlement Act in *Narragansett Indian Tribe.* The dispositive finding in that case was that Congress, in passing the Indian Gaming Regulatory Act ("Gam-

---

**19.** The Court is especially mindful of the early statement of the Supreme Court that "the power to tax involves the power to destroy," *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 431, 4 L.Ed. 579 (1819), and the "cate-

gorical approach" with respect to a state's power to tax reservation lands and Indians subsequently adopted by the Court. *Yakima,* 502 U.S. at 258, 112 S.Ct. 683; *see* n. 22, *infra.*

ing Act"), had impliedly repealed the Settlement Act with respect to gambling activities. 19 F.3d at 704–05.

Regarding section 1708 of the Settlement Act,[20] Judge Selya, writing for the court, considered whether its scope encompassed the State's civil regulatory jurisdiction. In concluding that it did, the court examined the evolution of the language, as expressed in the JMOU, the original Senate bill, and the final enacted version:

> [t]he progressive development of the jurisdictional language can more plausibly be interpreted as intended to clarify the breadth of the grant, rather than to narrow it. . . . "Civil and criminal laws and jurisdiction" more obviously includes all sorts of jurisdiction, and can fairly lay claim to being the broadest of the three formulations.

*Id.* at 695.

The court, of course, carefully circumscribed its holding to the particular issue before it, acknowledging that it could not answer "all the relevant questions" pertaining to the contours of the concurrent sovereignty of State and Tribe. Nevertheless, in explaining its conclusions with respect to the interplay between the Settlement and Gaming Acts, the court "offer[ed] a few words of guidance" regarding the shared jurisdiction of the State and the Tribe:

[t]his means that the state continues to possess a quantum of regulatory authority. Of course, any effort by the state to exercise this residual authority is hedged in by barriers on both sides: on one side, by the Tribe's retained rights of sovereignty; on the other side, by the Tribe's congressionally approved authority over a specific subject matter, namely, gaming. Testing the sturdiness of one or the other of these barriers in a given case will require "a particularized inquiry into the nature of the state, federal, and tribal interests at stake." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). We cannot undertake such an inquiry in the abstract, and, thus, the jurisdictional status of the settlement lands remains ill-defined in certain respects. But that is the nature of litigation[.]

*Id.* at 705.[21]

■ The present case, therefore, is a challenge to the State's attempt to exercise its residual "quantum of regulatory authority" over the Settlement Lands in the context of the criminal enforcement of its Cigarette Tax Scheme. Neither this Court nor the court of appeals has confronted precisely the question of the extent to which the State may encroach upon the Tribe's Settlement Lands to enforce its criminal laws. Likewise, the Supreme

**20.** 25 U.S.C. § 1708(a) provides:
> In general
> Except as otherwise provided in this subchapter, the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island.

**21.** One of the two "barriers" adverted to by the court as a potential impediment to the exercise of the State's regulatory authority was removed shortly after the court issued its decision. "Congress, responding to Judge Coffin's suggestion [in his dissent in *Narragansett Indian Tribe* ], amended the Settlement Act to make clear that [the Gaming Act] had not preempted its grant of state jurisdiction." *Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335, 1338 (D.C.Cir.1998). The so-called "Chafee Amendment" to the Settlement Act, codified at 25 U.S.C. § 1708(b), survived an Equal Protection-based challenge in *Nat'l Gaming Comm'n*. *Id.* at 1342 ("The Chafee Amendment . . . represents a rational exercise of congressional authority to enforce the terms of the original agreement by which the Narragansetts regained tribal lands.").

Court has not issued definitive guidance on this questions. *See generally California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 214–15, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) ("Our cases, however, have not established an inflexible *per se* rule precluding state jurisdiction over tribes and tribal members in the absence of express congressional consent.").[22] However, where there is congressional authorization regarding state criminal jurisdiction, as there is here, there is little doubt about the matter. Section 1708 of the Settlement Act makes clear that the tribal lands are subject to the "criminal laws and jurisdiction" of the State. If that phrase is to have any meaning, it must include the right of State law enforcement officials to enter tribal property pursuant to a validly issued search warrant to seize contraband.[23]

Support for this conclusion is found in the fairly recent case of *Nevada v. Hicks*, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). There, Justice Scalia offered the following guidance on the circumstances in which a State may enforce its laws on tribal lands:

"When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." When, however, state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribal land, as exemplified in our decision in [*Colville*].... It is also well established in our precedent that States have criminal jurisdiction over reservation Indians for crimes committed ... off the reservation. While it is not entirely clear from our precedent whether the last mentioned authority entails the corollary right to enter a reservation (including Indian-fee lands) for enforcement purposes, several of our opinions point in that direction. In [*Colville*], we explicitly reserved the question whether state officials could seize cigarettes held for sale to nonmembers in order to recover the taxes due.

*Id.* at 362–63, 121 S.Ct. 2304 (citations omitted). The criminal enforcement provisions controlling the seizure of contraband cigarettes (*see* R.I. Gen. Laws §§ 44–20–35 through 44–20–38) are of the very kind not addressed in *Colville*. While the *Colville*

---

**22.** In footnote 17 of *Cabazon Band*, the Supreme Court discusses at length the special area of state taxation of Indian tribes, and the need for explicit congressional authorization. This is a topic to which, as noted above, the parties and the amici have devoted considerable effort, but which this Court must decline to address. The issue of enforcement of the criminal provisions of the Cigarette Tax Scheme, while related to, is not the same as the imposition of the tax itself. It is worth repeating that the alleged criminal violation is the holding for sale of unstamped cigarettes, not the failure to pay taxes on sales of those cigarettes. This may be a fine distinction, but it is a relevant one nevertheless. Therefore, in this writer's view, the special treatment which the Supreme Court has reserved for direct taxation of tribes by states does not apply to the criminal enforcement provisions of such laws, particularly where, as here, the Court holds that the Cigarette Tax is not a direct tax upon the Tribe.

**23.** This Court notes that there are criminal proceedings presently pending in Rhode Island District Court related to the events of July 14, 2003, and a recently filed civil action in this Court alleging that law enforcement officers violated tribal members' civil rights during the raid and the ensuing arrests. The Court takes no position on the legality of the process used to obtain the search warrant nor on the arrests of tribal officials and members in connection with its execution. Nor will it address the Tribe's procedural Due Process and Supremacy Clause arguments as to the search warrant, since the Complaint contains no allegations with respect to these constitutional theories.

Court expressly reserved judgment on the question of whether state officials could seize cigarettes held for sale on tribal land in violation of a state cigarette tax scheme,[24] this writer believes that when the holdings of *Colville* and *Hicks* are read in conjunction with the conferral of criminal and civil (which includes regulatory) jurisdiction contained in section 1708, it is beyond doubt that criminal law enforcement, including the seizure of contraband, on the Settlement Lands is permissible.

The Tribe raises two fundamental defenses to State enforcement of its Cigarette Tax Scheme on the Smoke Shop, neither of which is ultimately persuasive, but which do merit discussion.

### 1. *Indian Country*

Plaintiff's first line of defense against section 1708 involves the venerable concept of "Indian country," defined by statute as

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian

allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same. 18 U.S.C. § 1151(a).[25] "Generally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States." *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n. 1, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998).

The Tribe and its amicus supporters contend that the Settlement Lands are Indian country under subsection (a) of section 1151, and that "[w]hile Rhode Island, as a result of the Settlement Act, may have more authority in Indian country than some other states, it is patently erroneous to assert that Congress has relinquished superintendence over the [Settlement Lands]." ACLU Amicus Curiae Reply Mem. at 7; *see* Pl. Reply Mem. at 15 ("Nothing in the ... Settlement Act repeals, abrogates, or 'eclipses' the applicability of federal law on the Settlement Lands.").

The State counters that the Settlement Act specifically subjects the Settlement Lands to the jurisdiction of the State, simultaneously divesting (by implication) the federal government of all power over their superintendence. The State points not

---

**24.** The specific language of *Colville* on this question is as follows:

> The State in fact seized shipments traveling to the reservations from out-of-state wholesalers before being enjoined from doing so by the District Court.... We find that Washington's interest in enforcing its valid taxes is sufficient to justify these seizures.... It is significant that these seizures take place outside the reservation, in locations where state power over Indian affairs is considerably more expansive than it is within reservation boundaries.... Washington further contends that it may enter onto the reservations, seize stocks of cigarettes which are intended for sale to

> nonmembers, and sell these stocks in order to obtain payment of the taxes due. However, this question, which obviously is considerably different from the preceding one, is not properly before us.... We therefore express no opinion on the matter.

447 U.S. at 161–62, 100 S.Ct. 2069 (citations omitted).

**25.** "[T]he Supreme Court has repeatedly stated that the definition provided in section 1151 'applies to questions of both criminal and civil jurisdiction.'" *Narragansett Indian Tribe of Rhode Island v. Narragansett Elec. Co.*, 89 F.3d 908, 915 (1st Cir.1996) (citing *Cabazon Band*, 480 U.S. at 208, 107 S.Ct. 1083).

only to section 1708, but also to 25 U.S.C. § 1707(c), which states that the federal government "shall have no further duties or liabilities under this subchapter with respect to the Indian Corporation or its successor, the State Corporation, or the settlement lands[,]" once it has fulfilled its obligations under sections 1704, 1705, 1706, and 1707.[26] "It is hard to imagine," argues the State, "an action that more clearly demonstrates an intent to relinquish federal superintendence than such a conveyance." Def. S.J. Mem. at 7.

■■■ Hard to imagine or not, it is ultimately not necessary to decide the point, and the Court declines to do so. Although it is true that "[f]ederal recognition and federal land trusteeship ordinarily have the effect of making tribal land 'Indian country' subject to federal law, not state law," *Nat'l Indian Gaming Comm'n*, 158 F.3d at 1341, such is obviously not the case here. Federal courts have found time and again that the State continues to possess a "quantum" of jurisdictional power over the Settlement Lands, notwithstanding the impact of federal recognition. *Id.* at 1342 (citing *Narragansett Indian Tribe*, 19 F.3d at 695 ("at every salient moment, the parties in interest took pains to reaffirm section 1708['s grant of state jurisdiction]")). In other words, even if the Settlement Lands are Indian country as the Tribe contends (a conclusion on which the Court takes no position), that fact alone would not necessarily strip the State of power to enforce the Cigarette Tax Scheme as to cigarettes sold at the Smoke Shop.[27] Likewise, a determination that the Settlement Lands are not Indian country would not inexorably compel the conclu-

sion that the State may enforce these laws. As Judge Selya pointed out so presciently, the Tribe's retained rights of sovereignty exist as a counterweight to the jurisdictional power asserted by the State, and issues, as they arise, must be decided by the measurement and balancing of those rights in the specific factual context of each case. Consequently, the question of whether the Settlement Lands are Indian country must be left for future litigation, or clarification by Congress.

### 2. *The "Tribe"/"Land" Distinction*

The Tribe's second contention is that section 1708 confers no power to the State over the Tribe itself. From this, the Tribe essentially concludes that the State is without authority to enforce the Cigarette Tax against the Tribe because it is the Tribe that is selling the cigarettes, not simply Indians or non-tribal members using the land.

In fact, the distinction between the State's power over the Settlement Lands and its power over the Tribe itself is the primary theme resounding throughout the submissions of the Tribe and its amicus supporters. *See, e.g.,* Pl. S.J. Mem. at 22–29, 64–69; Pl. Reply Mem. at 36–39; *see also* ACLU Amicus Curiae Mem. at 8–10; Prof. Gavin Clarkson Amicus Curiae Mem. at 15–16. And it is in the consideration of this argument that the Court conducts the "particularized inquiry" called for in *Narragansett Indian Tribe*, balancing the Tribe's claim of sovereignty against the interests of the State. 19 F.3d at 705 (citing *White Mountain Apache Tribe v.*

---

26. All of these sections relate to the acquisition by the Secretary of the Interior of the Settlement Lands and their conveyance to the State Corporation.

27. This position is essentially conceded by the ACLU. If Rhode Island "may have more au-

thority in Indian country than some other states," then it remains for this Court to determine whether that "more" is broad enough to encompass the power to enforce the Cigarette Tax.

*Bracker,* 448 U.S. 136, 145, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980)).

The Tribe relies heavily on *Maynard v. Narragansett Indian Tribe,* 798 F.Supp. 94 (D.R.I.1992), *aff'd,* 984 F.2d 14 (1st Cir.1993). *Maynard* involved a claim by a private landowner whose land abutted the Settlement Lands against the Tribe for alleged harassment of the landowner's invitees. Plaintiff Maynard argued that the Tribe had waived its sovereign immunity from suit by agreeing to the condition in the JMOU that eventually resulted in section 1708. Senior Judge Pettine disagreed:

> Jurisdiction over tribal lands simply does not confer jurisdiction over the tribe itself.... [I]t is clear that § 1708 does not waive or abrogate the Tribe's sovereign immunity. Any waiver or abrogation of sovereign immunity must be expressly and clearly stated; § 1708 does not contain such a waiver.

798 F.Supp. at 97–98 (footnote omitted). In affirming the dismissal, the First Circuit held that "[t]he Tribe's surrender of its right to sue for non-settlement lands neither says nor implies anything about a surrender of its sovereign immunity from suit relating to its territorial or extraterritorial actions." 984 F.2d at 16. *Maynard,* therefore, stands for the now widely accepted proposition that section 1708 is not a waiver or abrogation of the Tribe's sovereign immunity from suit. Since it is the Tribe which brought this action (and since the State's Complaint has been dismissed for want of jurisdiction), the Court is not asked to infer anything with respect to a waiver of sovereign immunity from suit; that issue is not before the Court. *See McClendon v. United States,* 885 F.2d 627, 630 (9th Cir.1989) ("Initiation of a lawsuit necessarily establishes consent to the court's adjudication of the merits of that particular controversy.").

But the Tribe seeks to ascribe to *Maynard* a more far-reaching proposition that section 1708 is wholly inapplicable to any situation in which tribal sovereign immunity is asserted as a defense. This Court cannot agree with this sweeping interpretation. In fact, the *Maynard* district court did not endorse the argument advocated by counsel for the Tribe—that the Tribe, by virtue of its status as a sovereign political entity, may engage in virtually any activity it pleases and may do so with impunity, unaffected by the laws of any other sovereign, so long as it labels the activity "tribal." Senior Judge Pettine put it this way:

> Section 1708 purports to give the state jurisdiction over settlement lands. The parameters of this jurisdictional grant are vague; the Tribe believes the entire section is moot. However, an example may be helpful. While the Court holds that § 1708 does not give jurisdiction over the Tribe *qua* tribe, it is fair to say that the state would have jurisdiction over a murder committed on Indian (settlement) land.

798 F.Supp. at 97 n. 3. Thus, under Judge Pettine's analysis, when the Tribe acts *"qua* Tribe," that is, as the political entity responsible for governing the Narragansetts, it is not subject to the State's civil and criminal laws and jurisdiction.

This, of course, is sensible because "Indian tribes are 'distinct, independent *political* communities, retaining their original natural rights' *in matters of local governance." Narragansett Indian Tribe,* 19 F.3d at 701 (citing *Santa Clara Pueblo,* 436 U.S. at 55, 98 S.Ct. 1670) (quoting *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832)) (emphasis supplied). These retained rights of sovereignty in matters of local governance "include[ ] the power of Indians to make and enforce their own substantive law in inter-

nal matters, including matters such as membership rules, inheritance rules, and the regulation of domestic relations." *Id.* And the Tribe's retained rights of sovereignty comprise a host of other governmental and political powers far too numerous to list here, all of which relate directly to "the regulation by [the Tribe] of [its] own domestic affairs [and] the maintenance of order and peace among [its] own members by the administration of [its] own laws and customs." *Ex Parte Crow Dog,* 109 U.S. 556, 568, 3 S.Ct. 396, 27 L.Ed. 1030 (1883); *see also Hicks,* 533 U.S. at 361, 121 S.Ct. 2304 (Indian sovereignty involves "the principle that Indians have the right to make their own laws and be governed by them"); Felix S. Cohen, *Handbook of Federal Indian Law* 122 (1988) ("Indian self-government, the decided cases hold, includes the power of an Indian tribe to adopt and operate under a form of government of the Indians' choosing, to define conditions of tribal membership, to regulate domestic relations of members, to prescribe rules of inheritance, to levy taxes, to regulate property within the jurisdiction of the tribe, to control the conduct of members by municipal legislation, and to administer justice.").

So it is not unreasonable to conclude that the power of the State to enforce its criminal laws on tribal land is not without some limitation or boundary, by virtue of the Tribe's retained rights of sovereignty. There may possibly be situations in which the State's criminal regulatory enforcement powers encroach on matters directly impacting the Tribe's sovereignty. But, having alluded above to the broad range of activities that are widely believed to fall within the classification "matter of local governance," that phrase is not, as the Tribe would have it, a meaningless relativism. It is folly to suggest (as the Tribe does) that a "matter of local governance" encompasses every conceivable act to which the stamp "Tribe-approved" is affixed. Rather, case by case, the "sturdiness" of the Tribe's retained sovereignty is (and, no doubt, will continue to be) perpetually re-tested and balanced against the particular jurisdictional power asserted by the State—"that is the nature of litigation." *Narragansett Indian Tribe,* 19 F.3d at 705.

In this litigation, the narrow issue is whether the Tribe may operate a retail cigarette store without complying with the applicable state tax laws and without fear of enforcement of these laws. It seeks a declaration that it may conduct this and any other retail operation [28] unsaddled by the yoke of enforcement of the State's tax laws and regulations. But the Tribe cannot avoid enforcement of the law merely by asserting categorically that the decision to engage in the activity was made by the tribal government. Operating a for-profit business enterprise, such as the Smoke Shop, may well be a lucrative source of revenue for the Tribe, and nothing said here should be construed as disparaging the Tribe's right to engage in activities which develop and improve its economic weal. The question, however, is whether the activity in which the Tribe is engaged (in this case, the retail sale of cigarettes) is one that fundamentally sounds in core sovereign functions of the Tribe, and if so, whether the obligation imposed by the State, via the Cigarette Tax Scheme and the criminal jurisdiction as to the Settlement Lands vested by section 1708, im-

---

**28.** Although the Tribe requests a declaration with respect to the retail sale of "any other products this Court deems just," this Court declines the invitation to address any activity other than the one presented in this case—the retail sale of cigarettes at the Smoke Shop. To delve into other retail activities would likely constitute a "gratuitous exploration of uncharted constitutional terrain." *El Dia,* 963 F.2d at 494.

properly impinges upon the Tribe's retained sovereignty.[29]

*Akins v. Penobscot Nation*, 130 F.3d 482 (1st Cir.1997) provides a useful framework for answering this question in this and future cases. In *Akins*, the First Circuit considered the definition and scope of the phrase "internal tribal matters," as used in the Maine state act implementing the federal Maine Indian Claims Settlement Act of 1980 ("Maine Settlement Act").[30] The specific language of the Maine implementing act made the Penobscot Nation subject "to all the duties, obligations, liabilities and limitations of a municipality ... provided, however, that internal tribal matters ... shall not be subject to regulation by the State." *Id.* at 485 (citing Me.Rev.Stat. Ann. tit. 30, § 6206(1)). Plaintiff Akins, an Alabama resident and member of the Penobscot Nation, sued the Nation over its policy of prohibiting anyone from obtaining "stumpage," or logging, permits who was not both a Nation member and Maine resident. *Id.* at 483–84. Because the Maine Settlement Act provided that "the Nation is subject to the laws of Maine," the question for the First Circuit was whether the issuance of stumpage permits was an "internal tribal matter." "Put differently, the Nation in certain capacities functions as a municipality of Maine and is reachable under state and federal law in that capacity, *but when it functions as a tribe as to internal tribal matters, it is not.*" *Id.* at 485 (emphasis supplied).

The court turned first to the Maine state implementing statute, which provided a non-exclusive list of "internal tribal matters."[31] None of the "exemplars" listed, including "tribal government," properly encompassed the stumpage permit policy. The First Circuit noted, as this writer has above, that merely because "a tribe attempts to govern a matter does not render it an internal tribal matter." *Id.* at 486. More is required to envelop an activity in the shroud of tribal sovereign immunity.

To resolve the matter, the court set out a five-factor test designed to gauge whether a particular activity could be considered an "internal tribal matter," leading to the conclusion that the stumpage policy so qualified:

> First, and foremost, the policy purports to regulate only members of the tribe, as only tribal members may even apply for permits. The interests of non-members are not at issue.... Second, the policy has to do with the commercial use of lands acquired by the Nation with the

---

**29.** It is possible to infer from the Tribe's submissions the alternative argument that section 1708 applies only to the Settlement Lands themselves, but not to persons acting on the Settlement Lands. This position, if indeed it is espoused, is nonsensical. The Settlement Lands cannot be prosecuted for violating the State's law against murder, or sued for discriminating against an employee on the basis of sex, or made to comply with zoning ordinances. If section 1708 is to have any meaning, it must apply (or not) to persons acting or present upon the Settlement Lands. *Cf. Narragansett Indian Tribe*, 19 F.3d at 705 ("The crucial questions which must yet be answered principally deal with the nature of the regulable activities which may—or may not—be subject to state control, *e.g.*, zoning, traffic control, advertising, lodging.").

**30.** The Maine Indian Claims Settlement Act, whose history is recounted in *Akins*, had its genesis in claims by members of various Indian tribes to ancestral lands located in Maine. 130 F.3d at 484. As in Rhode Island, the tribes and Maine negotiated a settlement which was codified under Maine and federal law.

**31.** These were "membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income." *Id.* at 486 (citing Me.Rev.Stat. Ann. tit. 30, § 6206(1)).

federal funds it received for this purpose as part of the settlement agreement.... Third, the policy concerns the harvesting of a natural resource from that land; and permit fees benefit the Penobscot Nation. The control of the permitting process operates as a control over the growth, health, and reaping of that resource. Fourth, the policy, at least on its face, does not implicate or impair any interest of the state of Maine. Fifth, it is consistent with prior legal understandings to view the issuance of stumpage permits as an internal tribal matter. *Id.* at 486–87. The First Circuit supported the factors it had selected by observing that the stumpage policy

> is not a dispute between Maine and the Nation over the attempted enforcement of Maine's laws.... This is instead a question of allocation of jurisdiction among different fora and allocation of substantive law to a dispute between tribal members where neither the Congress nor the Maine Legislature has expressed a particular interest.

*Id.* at 487–88.

The operation of the Smoke Shop, when measured against the *Akins* factors, compels a different conclusion. While it is true that the Smoke Shop is on tribal land, and its revenues support the Tribe, in virtually every other aspect the Smoke Shop fails the *Akins* test. The interests of tribal non-members (*e.g.,* the great majority of Smoke Shop customers who seek to avoid the Cigarette Tax, as well as the general citizenry of Rhode Island) are directly affected by the Tribe's decision not to comply with the Cigarette Tax Scheme.

Cigarette buyers avoid taxes that they owe; and the general public picks up the tab for lost state revenue in the form of higher taxes. The Smoke Shop is also in no way especially connected with the "commercial use of" the Settlement Lands themselves,[32] or the regulation of harvesting of any natural resource on those lands. And it need hardly be said that this case directly affects (or "implicates or impairs") the interests of the state of Rhode Island. By *Akins'* standards, therefore, the operation of the Smoke Shop without question would not be considered an "internal tribal matter" under the Maine Settlement Act.

At oral argument, counsel for the Tribe attempted to distinguish and isolate *Akins* on the ground that the history and language of the Maine Settlement Act is unique. It is true that the Maine Settlement Act contains detailed and extensive instructions on the limits of jurisdictional authority that may be exercised, respectively, by the governments of the United States, Maine, and the several subject Indian tribes. *See* 25 U.S.C. § 1725(a)-(i). And it is also true that the scope of what properly may be categorized as an "internal tribal matter" may or may not be co-extensive with the classification "retained right of sovereignty." However, irrespective both of the Maine Settlement Act's uniqueness, and of the possible subtleties in meaning distinguishing the phrases "internal tribal matter" and "retained right of sovereignty,"[33] the *Akins* factors provide valuable direction to courts seeking to draw the line between sovereign and non-sovereign activities. At stake in this case

---

32. Although it may be true that the Smoke Shop is a commercial enterprise situated on Settlement Lands, there is no particular nexus (as there was in *Akins* ) between the operation of the Smoke Shop and the subject lands. *Cf. id.* at 487 ("The policy regulates the very land that defines the territory of the Nation, and so appears to be a 'tribal' matter.").

33. In fact, this Court does not believe that there is a significant difference between these concepts. In *Akins,* the Penobscot Nation supported its interpretation of "internal tribal matters" by contending that it should be free to "exercise its residual sovereignty" to further its economic interests. 130 F.3d at 487. That is essentially the Tribe's position here.

is not the alleged right of the Tribe to govern its own members, but rather the alleged right to provide a tax windfall to cigarette consumers at the State's expense. It is not a close call. If, as has already been held, the jurisdictional grant to the State over the Settlement Lands vested by section 1708 is "rather broad," *Narragansett Indian Tribe*, 19 F.3d at 701, it surely reaches the Tribe's unlawful attempt to offer consumers a means to bypass the Cigarette Tax which would not otherwise be available to them off of the Settlement Lands.

 In sum, whether a "retained right of sovereignty," as used in the context of Indian law and as applied in this case, may shield a particular activity from the enforcement of State law, comes down to this: whether the persons affected by the particular activity in which a tribe is engaged are tribal members; and whether the activity may properly be described as "governmental" in nature (*i.e.* when the Tribe acts "*qua* Tribe"). The Tribe's decision to operate the Smoke Shop, without complying with the Cigarette Tax Scheme's obligations with respect to acquiring and affixing tax stamps, fails to satisfy either criterion. This activity (1) directly and primarily affects non-members, and (2) is not inherently governmental or political in nature, for all of the reasons discussed previously. Operating the Smoke Shop while avoiding the obligations imposed by the State's Cigarette

Tax is not a right of sovereignty retained by the Tribe, and the State consequently may enforce the Cigarette Tax by lawful entry onto the Settlement Lands and seizure of contraband cigarettes.[34]

## IV. Conclusion

For the foregoing reasons, the State's Complaint is dismissed and remanded to Washington County Superior Court for lack of subject matter jurisdiction. As to the federal action, Plaintiff's Motion for Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is GRANTED. Furthermore, the Court makes the following declarations: (1) the legal incidence of the State's Cigarette Tax falls on the consumer, and not the Tribe; (2) the State did not violate federal law or the Tribe's sovereign rights when it enforced its criminal statutes by executing a search warrant, and making arrests pursuant to that warrant, on tribal land; and (3) the Tribe must comply with the Cigarette Tax if it wishes to continue to sell cigarette products on the Settlement Lands.

IT IS SO ORDERED.

**34.** It is possible (and perhaps worthwhile) to engage in a debate about whether less intrusive means were available to the State to enforce its tax scheme, means which would have been more respectful of the Tribe's sovereignty. For example, it is possible that the cigarettes could have been seized before they entered tribal land, as in *Colville;* or, perhaps, the State could have sought enforcement through a civil action in lieu of invading the Settlement Lands and seizing the contraband. While this debate may indeed be a legitimate and necessary one, this writer is of the view that imposition of a "less intrusive means" test is unwarranted under the facts presented by this case. This is not to say, however, that in some context or set of facts yet to be tested, the State's authority to conduct invasive raids upon tribal land might not be so circumscribed by this Court. In other words, nothing in this opinion should be read to suggest that the State's ability to enter upon tribal land to enforce its criminal/regulatory laws is limitless, or that State authorities may act with impunity. It is not; and they may not.