OPINION EN BANC
SELYA, Circuit Judge.
This case pits the Narragansett Indian Tribe (the Tribe) against the State of Rhode Island (the State).[1] It requires us to answer a challenging question of first impression: May officers of the State, acting pursuant to an otherwise valid search warrant, enter upon tribal lands and seize contraband (in this case, unstamped, untaxed cigarettes) owned by the Tribe and held by it for sale to the general public?
The district court answered this question affirmatively. See Narragansett Indian Tribe v. Rhode Island, 296 F.Supp.2d 153, 170 (D.R.I.2003). A panel of this court disagreed in part, holding that the Tribe’s sovereign immunity insulated it from the State’s criminal process. See Narragansett Indian Tribe v. Rhode Island, No. 04-1155, slip op. at 36, 2005 WL 1119758 (1st Cir. May 12, 2005). The en banc court withdrew Parts 11(D)(3) and (4) of that opinion, id. at 29-36, and ordered rehearing en banc limited to the questions of whether, to what extent, and in what manner Rhode Island may enforce its civil and criminal laws with respect to the particular activities of the Tribe here at issue.
After careful review, we hold that, given the language and intent of the Rhode Island Indian Claims Settlement Act (the Settlement Act), 25 U.S.C. §§ 1701-1716, state officers were authorized to execute the warrant against the Tribe and to arrest tribal members incident to the enforcement of the State’s civil and criminal laws. We therefore affirm the judgment of the district court.
I. BACKGROUND
We begin with a synopsis of the unique relationship between the Tribe and the State and then turn to the particulars of the current dispute. For these purposes, we assume the reader’s familiarity with the history of the dispute as described in the opinions of the district court and the panel.
A. The Relationship Between the Tribe and the State.
The Narragansett Indians, aboriginal inhabitants of what is now Rhode Island, enjoyed cordial relations with the early English settlers on Roger Williams’s Providence Plantations. This peaceful coexistence ended in 1675, when the Tribe was drawn into King Philip’s War against Puritan colonists. The war decimated the Tribe, and its surviving members settled in the vicinity of what is now Charlestown, Rhode Island. In 1880, after nearly a century of resistance to the State’s assimilation efforts, the Tribe agreed to surren *19 der its tribal authority and to sell all but two acres of its lands for the sum of $5,000. Almost immediately, the Tribe regretted the sale. In an effort to recoup the lands, it launched a protracted legal and political battle. See generally Narragansett Indian Tribe v. Nat’l Indian Gaming Comm’n, 158 F.3d 1335, 1336 (D.C.Cir. 1998).
This endeavor reached a fever pitch in 1975, when the Tribe filed a pair of complaints in the United States District Court for the District of Rhode Island. In these complaints, the Tribe alleged that it possessed approximately 3,200 acres of land as part of its aboriginal territory; that the 1880 conveyance of that land mass was void under the Indian Nonintercourse Act, 25 U.S.C. § 177, because the State failed to secure federal approval; and that, inasmuch as its aboriginal title had never been extinguished, the Tribe held a claim of title superior to that of any landowner whose chain of title depended upon the 1880 sale. See id. at 1336-37.
The pending litigation clouded the titles of hundreds of Rhode Island landowners. To dissipate this cloud, the State, the town of Charlestown, and the affected landowners, as parties of the first part, and the Tribe, as party of the second part, executed a joint memorandum of understanding (the J-Mem) on February 28, 1978. The J-Mem created a carefully calibrated relationship between the Tribe and the State centering on 1,800 acres of land in and around Charlestown (the settlement lands). The J-Mem provided that the settlement lands would be formed out of two parcels, one donated by the State and the other purchased from private landowners with funds furnished by the federal government. The Tribe gained effective control of the settlement lands in exchange for the relinquishment of its claims, the voluntary dismissal of its lawsuits, and its agreement that, with the exception of state hunting and fishing regulations, “all laws of the State of Rhode Island shall be in full force and effect on the settlement lands.” In addition to donating half the settlement lands, the State agreed to create an Indian-controlled corporation to hold the settlement lands in trust for the Tribe, to exempt the settlement lands from local taxation, and to work toward securing passage of the federal legislation necessary to implement the agreement. See generally Narragansett Indian Tribe v. Rhode Island, 296 F.Supp,2d at 161.
Both the Rhode Island General Assembly and Congress subsequently passed the necessary enabling legislation. See R.I. Gen. Laws §§ 37-18-1 to 37-18-15; 25 U.S.C. §§ 1701-1716. Dovetailing with the counterpart provision of the J-Mem, the federal piece of this legislative mosaic—the Settlement Act—declared that “the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island.” 25 U.S.C. § 1708(a).[2]
The conveyances to the holding company followed apace. The Secretary of the Interior thereafter granted the Tribe official federal recognition. See 48 Fed.Reg. 6,177-6,178 (Feb. 2, 1983). On the heels of this recognition, the settlement lands changed hands twice more. In 1985, the Rhode Island General Assembly amended the pertinent state statute to permit the conveyance of the settlement lands directly to the Tribe; the amendments included a provision that preserved the State’s jurisdiction over the settlement lands in terms substantially identical to those memorialized in section 1708(a). See R.I. Gen. *20 Laws 37-18-13(b). The holding company later made the authorized conveyance.
Three years thereafter, the Tribe deeded the settlement lands to the Bureau of Indian Affairs (the BIA) as trustee. The trust deed explicitly confirmed the applicability of state law on the settlement lands as provided by section 1708(a). The BIA continues to hold the settlement lands in trust for the Tribe. See Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 689, 695 & n. 8 (1st Cir.1994).
During the next quarter-century, the relationship between the Tribe and the State was fraught with tension. See, e.g., id. at 690-91 (chronicling a long-running dispute anent the Tribe’s desire to conduct gambling operations on the settlement lands). Having failed in its persistent efforts to launch a gaming facility, the Tribe eventually turned to tobacco as a potential source of revenue. This case represents the culmination of that endeavor.
B. The Controversy at Hand.
Rhode Island law establishes a complex scheme for the taxation of cigarettes. See R.I. Gen. Laws §§ 44-20-1 to 44-20-55. Under that scheme, the State imposes an excise tax on all cigarettes sold, distributed, or held for sale or distribution within its borders. Id. §§ 44-20-12, 44-20-13. The excise tax is collected through the sale of cigarette stamps, which must be affixed to every package of cigarettes brought into the State. Id, §§ 44-20-13, 44-20-18, 44-20-29. A dealer has twenty-four hours after coming into possession of unstamped cigarettes within which to affix the stamps. Id, § 44-20-29. The sale or purchase of unstamped cigarettes is a misdemeanor. Id, §§ 44-20-33, 44-20-35, 44-20-36. Unstamped cigarettes are contraband and, as such, are subject to seizure by the State. Id. § 44-20-37.
On July 12, 2003, the Tribe, acting pursuant to a tribal ordinance, opened a smoke shop on the settlement lands. The smoke shop offered an array of cigarettes for sale to the general public (i.e., members of the Tribe and nonmembers alike). The Tribe’s avowed purpose in establishing the smoke shop was to generate funds for its social programs.
Believing that the State lacked the legal authority to compel its compliance with the cigarette tax scheme, the Tribe refused to purchase cigarette stamps. It also refused to precollect the State’s sales tax, see id, § 44-18-19, from those who purchased the Tribe’s cigarettes. By dint of these refusals, the Tribe was able to sell unstamped, untaxed cigarettes at prices substantially below market.
On July 14, 2003, Rhode Island State Police entered the settlement lands and raided the smoke shop. Their intent was to seize contraband cigarettes pursuant to a search warrant issued by a state court of competent jurisdiction. Despite the warrant, the troopers’ entry sparked an altercation with members of the Tribe. When the smoke cleared, the troopers had arrested eight individuals, including the Tribe’s Chief Sachem, and had confiscated the Tribe’s entire inventory of unstamped, untaxed cigarettes.
In the aftermath of this acrimonious episode, the Tribe filed suit in the federal district court, seeking a declaratory judgment that its sovereign status as a federally recognized Indian tribe precluded the State from applying its cigarette tax scheme to the Tribe’s sale of cigarettes on the settlement lands. Relatedly, the Tribe sought a declaration that sovereign immunity insulated it from the State’s criminal process and shielded from arrest those tribal members who had participated in the operation of the smoke shop. After submitting the case on stipulated facts, the *21 parties cross-moved for summary judgment.
The district court granted brevis disposition in the State’s favor, grounding its decision on two crucial determinations. First, the court concluded that the legal incidence of the cigarette tax fell on the purchaser rather than the seller and that, therefore, the Tribe had to comply with the tax scheme when selling cigarettes on the settlement lands. 296 F.Supp.2d at 167. Second, the court concluded that section 1708(a) of the Settlement Act authorized state officers to enter the settlement lands, seize the Tribe’s stock of unstamped, untaxed cigarettes, and arrest tribal members working in the smoke shop. Id. at 170, 177.
The Tribe appealed. A panel of this court affirmed in part and reversed in part. The panel accepted the district court’s determination that the Tribe must comply with the State’s cigarette tax scheme when selling cigarettes on the settlement lands.[3] Op. at 24 - 25. The panel disagreed, however, with the lower court’s ruling that the State could enforce the cigarette tax scheme through the execution of a search warrant against the Tribe. Id. at 33. Although section 1708(a) preserved the State’s criminal jurisdiction over the settlement lands, the panel reasoned, it did not grant the State criminal jurisdiction over the Tribe and, accordingly; the Tribe’s sovereign immunity prevented the State from executing a search warrant against the Tribe, hi. at 33.
On the State’s petition, see Fed. R.App. P. 35(b), we vacated the portions of the panel opinion relating to the State’s enforcement powers and granted rehearing en banc on the narrow questions of “whether, to what extent, and in what manner Rhode Island may enforce its civil and criminal laws with respect to the operation of the [s]moke [s]hop by the Narragansett Indian Tribe” and “the effect (if any) of tribal sovereign immunity” on the State’s enforcement authority. Narragansett Indian Tribe v. Rhode Island, 415 F.3d 134 (1st Cir.2005) (unpublished order). We turn now to those questions.
II. ANALYSIS
It is beyond peradventure that a state may seize contraband cigarettes located outside Indian lands but in transit to a tribal smoke shop. See Washington v. Confed. Tribes of Colville Indian Reserv., 447 U.S. 134, 161-62, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). Withal, the question of whether a state, as a general matter, may enter Indian lands and seize unstamped cigarettes owned by an Indian tribe is open. See id. at 162, 100 S.Ct. 2069. We need not answer that vexing question in the abstract; here, the plain language and purport of the J-Mem and the Settlement Act supply the answer with respect to activities on the settlement lands.
We bifurcate our analysis, first addressing whether the State may execute a search warrant on the settlement lands and then muffing whether tribal sovereign immunity can be said to prevent the State from executing such a warrant against the Tribe and from arresting tribal members involved in the smoke shop enterprise.[4]
*22 A. The Ability to Execute a Search Warrant.
The State asseverates that the J-Mem and the Settlement Act, when read in light of the unique historical context in which they arose, permitted state officers to execute a search warrant on the settlement lands as part of the due enforcement of the State’s cigarette tax scheme. We think that proposition is correct.
The Tribe agreed in the J-Mem (with certain modest exceptions not relevant here) that “all laws of the State of Rhode Island shall be in full force and effect on the settlement lands.” That agreement did not materialize out of thin air; it followed intense negotiations and led to the Tribe’s receipt of over 1,800 acres of land. Congress confirmed this negotiated arrangement in the Settlement Act, mandating (again with explicit but modest exceptions) that “the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island.” 25 U.S.C. § 1708(a). As the unqualified language of both the J-Mem and the Settlement Act makes pellucid, the authority ceded to the State and assented to by the Tribe was broad in its terms. The negotiated arrangement and the confirmatory statute effectively extinguished the Tribe’s right to resist the application of state authority as to matters occurring on the settlement lands. And that arrangement drew no distinction between tribal members and the Tribe itself, on the one hand, and the general public, on the other hand.
In effect, then, the Tribe abandoned any right to an autonomous enclave, submitting itself to state law as a quid pro quo for obtaining the land that it cherished. It is surpassingly difficult to imagine what the linguistic formulation that embodied this concession would entail if not an acknowledgment that the State may enforce its applicable criminal laws on the settlement lands by conventional means; any contrary interpretation would make the relevant provisions of both the J-Mem and the Settlement Act meaningless. The execution of a search warrant referable to violations of the State’s legally binding cigarette tax scheme falls squarely within the ambit of the ceded authority. Indeed, the carefully calibrated agreement between the Tribe and the State—an agreement from which, by virtue of the creation and conveyance of the settlement lands, the Tribe greatly benefitted—would be altered dramatically if the State were without power to enforce its binding laws through conventional means such as the execution of a search warrant on the settlement lands.
The J-Mem, the Settlement Act, and their historical antecedents make this case strikingly different from the mine-run of cases that have struggled to reconcile the sovereignty of Indian tribes with the legitimate interests of host states. Thus, we rest our decision squarely on these idiosyncratic features. We note, however— contrary to the view of our dissenting brethren—that the general body of Indian law also supports a conclusion that the State may undertake the enforcement activities at issue in this case.
The Supreme Court has held that because Congress has plenary power over *23 Indian matters, see Morton v. Mancari, 417 U.S. 535, 551-52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the assertion of state suzerainty within tribal lands is permissible where it has not been preempted by the operation of federal law. New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 333, 103 S.Ct. 2378, 76 L,Ed.2d 611 (1983). The application of federal preemption doctrine in Indian matters has special characteristics; it “calls for a particularized inquiry into the nature of the state, federal, and tribal interests at stake.” Id. (quoting White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 145, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980)). Courts must conduct this inquiry in the albedo of traditional notions of Indian sovereignty, including the settled federal policy of promoting Indian self-governance and the overarching goal of encouraging tribal self-sufficiency and economic development. Id. at 334-35, 103 S.Ct. 2378.
Employing this paradigm requires us to identify and weigh the competing state, federal, and tribal interests that obtain within the concrete factual context of this dispute. In conducting this tamisage, we are cognizant that Congress has not granted the Tribe any special powers with respect to the specific subject matter involved here (cigarette sales). This is important because, in the absence of special legislation, the balance of state, federal, and tribal interests in regard to cigarette taxation leaves considerable room for state intervention on tribal lands. See Dep’t. of Tax. & Fin. v. Milhelm Altea & Bros., 512 U.S. 61, 73, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994). Here, special legislation of a different sort—the Settlement Act-figures in the balance, and, as we have explained, that legislation increases the room ha-state intervention.
Keeping in mind that both the Tribe and its members are subject to a legal: obligation to comply with the State’s cigarette tax scheme, see supra note 3, it is readily evident that the State’s interest in maintaining the integrity of that scheme contrasts favorably with the Tribe’s interest in operating the smoke shop as a tax haven. Appropriate enforcement measures are needed to check wholesale transgressions of the State’s scheme by price-conscious purchasers willing to flout their legal obligations. See Moe v. Confed. Salish and Kootenai Tribes, 425 U.S. 463, 482, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). Enforcement is also necessary to prevent the Tribe “from marketing [its] tax exemption to nonmembers who do not receive significant tribal services and who would otherwise purchase their cigarettes” outside the settlement lands. Colville, 447 U.S. at 157, 100 S.Ct. 2069.
The Tribe’s countervailing interest is not impressive. Although the Tribe has a legitimate stake in generating revenue for its social programs free from umvarranted state interference, that interest is significantly weaker where, as here, it seeks to purvey goods made by outsiders—goods as to which the Tribe has only a fleeting commercial connection. See Mescalero Apache Tribe, 462 U.S. at 341, 103 S.Ct. 2378; see also Colville, 447 U.S. at 156-57, 100 S.Ct. 2069. Moreover, the fact that the Tribe and its members are legally required to comply with the State’s cigarette tax scheme makes it very difficult for the Tribe to identify any legitimate reason for resisting state enforcement of the scheme. In this case, then, the scales tip in favor of recognizing the State’s authority to execute a search warrant on the settlement lands.
Endeavoring to blunt the force of this reasoning, the Tribe importunes us to resurrect a line of cases that at one time insulated tribal action on tribal lands from state interference independent of federal *24 preemption. See, e,g., Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) (pronouncing that Indian tribes’ inherent sovereign right to “make their own laws and be ruled by them” constitutes a bar to state action on tribal lands). We reject these importunings. While the approach of treating inherent tribal sovereignty as an independent impediment to state action on tribal lands has never been abandoned by the Supreme Court in haec verba, the Justices have come to treat this doctrine as no more than a piece of the background against which preemption analysis must be conducted. See, e.g., Nevada v. Hicks, 533 U.S. 353, 362-64, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) (indicating that state officers may execute, on reservation lands, a search warrant referable to a tribal member’s off-reservation violation of state law); see also Colville, 447 U.S. at 156, 100 S.Ct. 2069; McClanahan v. Ariz. State Tax Comm’n, 411 U.S. 164, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).
To sum up, the J-Mern and the Settlement Act, seen in their historical setting, compel a conclusion that the State retains the authority to issue and enforce a search warrant relative to the sale of unstamped, untaxed cigarettes on the settlement lands. General principles of Indian law reinforce that conclusion.
B. The Effect of Tribal Sovereign Immunity.
To this point, we have determined that the State may enforce its cigarette tax scheme by executing an otherwise valid search warrant on the settlement lands. The remaining question is whether tribal sovereign immunity prohibits the State from executing such a warrant against the Tribe or from arresting tribal members participating in the operation of the smoke shop pursuant to a tribal ordinance. We believe that the resolution of this binary question is clearly adumbrated by our earlier discussion of the purpose and effect of the J-Mem and the Settlement Act.
At the threshold, we pause to confront a point made by our dissenting brethren. They suggest that our approach to this question disregards the “subtle but important” distinction between tribal sovereignty and tribal sovereign immunity announced in a decision of a panel of this court. Post at 32 (Lipez, J., with whom Torruella, J., joins, dissenting) (quoting Aroostook Band of Micmacs v. Ryan, 404 F.3d 48, 68 (1st Cir.2005)). This criticism rests on shaky ground. The Aroostook panel—with scant citation to authority— saw a distinction that is not apparent to us; it framed the distinction as being that the doctrine of tribal sovereignty contemplates that, in certain circumstances, a tribe “is not subject to state laws ... at all,” whereas tribal sovereign immunity “means that [a tribe] is not amenable to state judicial or quasi-judicial proceedings to enforce those laws.” Aroostook, 404 F.3d at 68 (emphasis in original). In our view, both the Aroostook panel’s sculpting of the distinction and its ensuing discussion of the scope of tribal sovereign immunity misread the applicable Supreme Court precedents and, thus, are incorrect. As we already have explained, “the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal preemption,” McClanahan, 411 U.S. at 172, 93 S.Ct. 1257; see Hicks, 533 U.S. at 362, 121 S.Ct. 2304, treating sovereignty instead as the source of “tribal power ... to protect tribal self-government or to control internal relations” through tribal regulation of activities on tribal lands, Montana v. United States, 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); see Hicks, 533 U.S. at 358-60, 121 S.Ct. 2304. Consistent with this trend, tribal sovereign *25 immunity is most accurately considered an incidence or subset of tribal sovereignty. See, e.g., Okla. Tax Comm’n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (indicating that tribal sovereign immunity is an incidence of tribal sovereignty). Consequently, we expressly overrule Aroostook with respect to the distinction in question and proceed with our bifurcated inquiry.
1. Confiscation of Cigarettes. The Tribe asserts that its sovereign status as a federally recognized Indian tribe immunizes it from state court process, including search warrants related to the enforcement of the State’s cigarette tax scheme. On this rationale, the State, even if it may enter the settlement lands and execute a search warrant against an individual, may not execute such a warrant against the Tribe or its property. As indicated above, see supra, Part 11(A), the State’s most potent retort is that the combined force of the J-Mem (by waiver) and section 1708(a) (by abrogation) defeats the Tribe’s claim of sovereign immunity. We find this retort dispositive.
An Indian tribe’s sovereign immunity may be limited by either tribal conduct (i.e., waiver or consent) or congressional enactment (i.e., abrogation). Kiowa Tribe v. Mfg. Techs., Inc., 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998); Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 29 (1st Cir.2000). While such actions must be clear and unequivocal in their import, see C & L Enters. v. Citizen Band Potawatomi Indian Tribe, 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 628 (2001), there is no requirement that talis-manic phrases be employed. Thus, an effective limitation on tribal sovereign immunity need not use magic words. See id, at 420-21, 121 S.Ct. 1589.
At the expense of repastinating ground already well-ploughed, we explain why we find both waiver and abrogation here. In the J-Mem, the Tribe, for valuable consideration received—1,800 acres of coveted land—explicitly acknowledged that, with certain modest exceptions not applicable here, “all laws of the State of Rhode Island shall be in full force and effect on the settlement lands.” (Emphasis supplied). This concession was an integral part of the bare-knuckled negotiations that created the settlement lands. Read in light of this unique historical context, the provision quoted above dearly and unambiguously establishes that the parties to the J-Mem intended to subjugate the Tribe’s autonomy on and over the settlement lands (and, thus, its sovereign immunity) to the due enforcement of the State’s civil and criminal laws. Any other interpretation of the J-Mem would defy common sense and, in the bargain, nullity the State’s most important quid pro quo. Hence, there was a waiver.
The record also evinces an abrogation of the Tribe’s sovereign immunity with respect to activities on the settlement lands. Unlike most other federal statutes touching on the complicated relationship between tribes and states, the Settlement Act codified an agreement based on “the mutual consent of all parties.” H.R.Rep. No. 95-1453, at 11 (1978), reprinted, in 1978 U.S.C.C.A.N. 1948, 1954. In order to effectuate the parties’ shared intent, the Settlement Act, consistent with the J-Mem, guaranteed that the settlement lands would be “subject to the civil and criminal laws and jurisdiction of the State of Rhode Island.” 25 U.S.C. § 1708(a) (emphasis supplied); see Narra gansett Indian Tribe, 19 F.3d at 695 & n. 8 (noting that, at all pertinent times, the Tribe and the State took pains to reaffirm section 1708(a)’s vitality).
*26 We must read statutes, whenever possible, to give effect to every word and phrase. United States v. Ven-Fuel, Inc,, 758 F.2d 741, 751-52 (1st Cir.1985). Moreover, we must presume that Congress acts with knowledge of relevant Supreme Court precedent. See Goodyear Atomic Corp. v. Miller, 486 U.S, 174, 184-85, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988). At the time Congress passed the Settlement Act, the Supreme Court already had adopted the approach of permitting the exercise of state jurisdiction within Indian lands where the exercise of such jurisdiction had not been preempted by federal law. See McClanahan, 411 U.S. at 172, 93 S.Ct. 1257; Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); Organized Vill. of Kake v. Egan, 369 U.S. 60, 74-75, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962). Thus, section 1708(a) would be mere surplusage if, as the Tribe contends, it contemplates no more than that the State may exercise jurisdiction within the settlement lands subject to the constraints of tribal sovereign immunity. In other words, if the reference to “jurisdiction” in section 1708(a) is to have any meaning, it must effectuate some limitation on the Tribe’s sovereign immunity. Combining this language with the historical background, we conclude that section 1708(a) largely abrogates the Tribe’s sovereign immunity.[5]
We say “largely” in an abundance of caution. We recognize that the Tribe may continue to possess some degree of autonomy “in matters of local governance,” in-eluding “matters such as membership rules, inheritance rules, and the regulation of domestic relations.” Narragansett Indian Tribe, 19 F.3d at 701. But that core group of sovereign functions, whatever its dimensions, is not implicated in this case. Here, the State is seeking to enforce laws binding on the Tribe’s commercial transactions with outsiders, not to dictate, say, tribal membership or inheritance rules. Whatever the exact contours of the Tribe’s retained sovereignty, those contours are narrow-and it is perfectly clear that trafficking in contraband cigarettes is not within them. Cf. Felix S. Cohen, Handbook of Federal Indian Law 122 (1988 ed.) (noting that “Indian self-government ... includes the power of an Indian tribe to adopt and operate under a form of government of the Indians’ choosing, to define conditions of tribal membership, to regulate domestic relations of members, to prescribe rules of inheritance, to levy taxes” and the like).
This result is consistent with two important principles. First, the Settlement Act, properly read, ensures that the State may demand the Tribe’s compliance with state laws of general application. Second, it also ensures that the State may use its entire armamentarium of legal means for redressing noncompliance. The “full force” of the State’s preserved criminal jurisdiction logically encompasses the enforcement of criminal laws that are binding on the Tribe’s commercial transactions With outsiders. That, in turn, encompass *27 es the authority to execute a search warrant against the Tribe for its violations of those laws on the settlement lands. We conclude, therefore, that, under the terms of the J-Mem and the Settlement Act, the Tribe is not immune from the execution of a search warrant secured as part of the State’s effort to enforce the Tribe’s obligation to comply with a legally applicable cigarette tax scheme.
Judge Torruella, in his separate dissent, calumnizes this construction of the Settlement Act, arguing that it is inconsistent with the canon of construction teaching that “statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.” Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). In Judge Torruella’s view, section 1708(a) is such a provision. See post at 39 (Torruella, J., dissenting). But that argument rests on a flawed premise. Section 1708(a), when read in light of the J-Mem and the unique historical context surrounding its enactment, clearly abrogates the Tribe’s sovereign immunity with respect to the State’s enforcement activities on the settlement lands. And because there is no ambiguity in the meaning and purport of section 1708(a), this case does not implicate the hoary canon of construction relied on by the dissent.
The dissenters attack our reading of the “full force and effect” language on a different front as well. They assert that the Supreme Court “has held that such language .. . does not waive or abrogate tribal sovereign immunity.” Post at 33-34 (Lipez, J., with whom Torruella, J., joins, dissenting). In support of this proposition, they rely on the Supreme Court’s refusal to construe language in a different federal statute (commonly referred to as Public Law 280) as an abrogation of tribal sovereign immunity. See Three Affiliated Tribes of Fort Berthold Reserv. v. Wold Eng’g, 476 U.S. 877, 892, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986). This reliance is mislaid: the historical context and purpose of Public Law 280 are so completely different from those of the Settlement Act that, despite some linguistic coincidences, the Court’s interpretation of that law has no bearing on the issues before us. We explain briefly.
Public Law 280 authorizes the courts of five enumerated states to assert jurisdiction over certain criminal and civil actions that may arise on designated Indian lands. See Pub.L. No. 83-280, §§ 2, 4, 67 Stat. 588, 588-90 (1953), codified as amended at 18 U.S.C. § 1162 and 28 U.S.C. § 1360. The law also prescribes a procedure by which any other state can extend its adjudicatory jurisdiction to actions arising in Indian country. See 25 U.S.C. §§ 1321-1322. The criminal jurisdiction component of Public Law 280 allows a state to assume “jurisdiction over offenses committed by or against Indians in .. . Indian country ... to the same extent that such State ... has jurisdiction over offenses committed elsewhere within the State” and mandates that “the criminal laws of such State ... shall have the same force and effect within such Indian country as they have elsewhere within the State.” 1.8 U.S.C. § 1162(a) (emphasis supplied). The civil jurisdiction component of Public Law 280 allows state courts to assume jurisdiction over “civil causes of action between Indians or to which Indians are parties which arise in ... Indian country” and directs that “those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere in the State.” 28 U.S.C. § 1360(a) (emphasis supplied).
Prior to the enactment of Public Law 280, the Supreme Court had held that *28 states had no jurisdiction to prosecute crimes committed on a reservation, so long as either the perpetrator or the victim was an Indian. See Williams v. United States, 327 U.S. 711, 714 & n. 10, 66 S.Ct. 778, 90 L.Ed. 962 (1946). In a similar vein, state courts historically have had no jurisdiction over civil suits against tribal members when the cause of action arose out of on-reservation activities. See, e.g., Lee, 358 U.S. at 222, 79 S.Ct. 269. For the most part, then, both types of cases were within the exclusive jurisdiction of tribal courts. See Bryan v. Itasca County, 426 U.S. 373, 379-83, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). But many tribal court systems failed to provide effective public and private justice to reservation Indians.
In an effort to ameliorate this situation, Congress enacted Public Law 280. See id. (explaining that Congress enacted the statute to correct this failure and to redress “the problem of lawlessness on certain Indian reservations” and “the lack of adequate Indian forums for resolving private legal disputes” involving reservation Indians). Accordingly, the predominant purposes of Public Law 280 were to provide reservation Indians with access to state courts and to authorize the application of state law to disputes arising in Indian country. Id. This background clearly differentiates Public Law 280⅛ extension of state jurisdiction over Indian lands from that contemplated by the Settlement Act. Publie Law 280 neither reflected the “mutual consent of all parties,” H.R.Rep. No. 95-1458, at 11 (1978), reprinted in 1978 U.S.C.C.A.N. 1948,1954, nor resulted from a negotiated arrangement in which a tribe surrendered certain sovereign rights in exchange for substantial concessions from the host state.[6]
If more were needed—and we doubt that it is—Public Law 280 was primarily intended to facilitate the extension of state adjudicatory jurisdiction over Indian country. See Bryan, 426 U.S. at 879-83, 96 S.Ct. 2102. By contrast, the purpose of the Settlement Act was to extend “all sorts of jurisdiction,” including state regulatory jurisdiction, over the settlement lands. Narragansett Indian Tribe, 19 F.3d at 695. Given the stark contrast between the purposes of these two statutes, comparing Public Law 280 and the Settlement Act is like comparing plums and pomegranates. It follows inexorably that the Supreme Court’s determination that Public Law 280’s “force and effect” language did not abrogate tribal sovereign immunity from civil suit is uninstruetive of the meaning of the “full force and effect” phrase in the context of the carefully calibrated agreement between the Tribe and the State.[7]
The Tribe takes a somewhat different path, averring that our conclusion that the J-Mem and the Settlement Act largely *29 cancel out the Tribe’s sovereign immunity is inconsistent with general principles of Indian law which, according to the Tribe, routinely vindicate claims of tribal sovereign immunity from state court process. We perceive no such inconsistency.
Most of the cases cited by the Tribe stand for the entirely unremarkable proposition that an Indian tribe is generally immune from civil suits brought by state governments or private individuals. See, e.g., Kiowa Tribe, 523 U.S. at 754, 118 S.Ct. 1700; Fletcher v. United States, 116 F.3d 1315, 1324 (10th Cir. 1997); Tamiami Partners v. Miccosukee Tribe of Indians, 63 F.3d 1030, 1048 (11th Cir.1995) (Tamiami II); Imperial Granite Co. v. Pala Band of Mission Indians, 940 F.2d 1269, 1271 (9th Cir.1991); see also TTEA v. Ysleta Del Sur Pueblo, 181 F.3d 676, 680-81 (5th Cir.1999) (holding that an Indian tribe enjoys sovereign immunity from an award of money damages only, not with respect to declaratory or injunctive remedies). However, these cases also recognize that tribal sovereign immunity may be circumscribed by waiver or abrogation. See, e.g., Kiowa Tribe, 523 U.S. at 754, 118 S.Ct. 1700; Fletcher, 116 F.3d at 1324; Tamiami II, 63 F.3d at 1038 n. 30. None of these cases arise under a statute configured in the fashion of the Settlement Act; nor do any of them address a state’s power to enforce its admittedly applicable criminal laws against a noncompliant Indian tribe. Consequently, they offer no insight into the question of whether the State may execute a search warrant against the Tribe on the settlement lands as part of its enforcement of the Tribe’s obligation to comply with binding state law.
The decision in Maynard v. Narragansett Indian Tribe, 984 F.2d 14 (1st Cir. 1993), does not require a different result. That case involved a civil suit against the Tribe for an alleged trespass on private property outside the settlement lands. Id. at 15. In upholding the district court’s dismissal of the complaint against the Tribe, a panel of this court indicated that neither the J-Mem nor the Settlement Act vitiated the Tribe’s sovereign immunity. Id. at 15-16. The facts of the Maynard ease dictate that any holding there was necessarily limited to civil suits premised on activities occurring outside the settlement lands. That holding may or may not be correct—the case at hand does not require us to say—but to the extent that Maynard contains dictum that is susceptible to a broader reading, see, e.g., id. at 16, that dictum is flatly incorrect, and we disavow it.[8]
In a last-ditch effort to salvage its case, the Tribe proffers a Ninth Circuit case holding that tribal sovereign immunity prohibits a state from executing a search warrant against an Indian tribe. Bishop Paiute Tribe v. County of Inyo, 291 F.3d 549, 560 (9th Cir.2002). The Tribe fails to mention that the Supreme Court subsequently vacated that decision, albeit on other grounds. See Inyo County v. Painte-Shoshone Indians of the Bishop Cmty. of the Bishop Colony, 538 U.S. 701, 712, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003). At any rate, the decision is easily distinguished. It neither addressed a state’s power to enforce its applicable criminal laws against a noncompliant Indian tribe nor involved a statute that had the teeth that Conpess implanted in the Settlement Act. Consequently, the decision offers no *30 guidance with respect to the unique relationship between the Tribe and the State in regard to activities occurring on the settlement lands.[9]
2. Arrests. The stipulated facts do not specify the basis for the arrests of tribal members during the raid. We accept for purposes of this appeal the Tribe’s contention that the persons in question were arrested because of their participation in a tribally owned enterprise (the smoke shop). Building on this contention, the Tribe maintains that its sovereign immunity shielded those individuals from arrest. The premise of this argument—that the Tribe itself enjoys immunity from the enforcement activities at issue in this case— is incorrect. See supra Part 11(B)(1). Accordingly, there is no derivative immunity available to the Tribe’s members.
We add, moreover, that even if the Tribe was entitled to the protection of sovereign immunity in this case—which it is not— that protection would not cover the tribal members involved in the operation of the smoke shop. The general rule is that tribal sovereign immunity does not protect individual members of an Indian tribe. See Puyallup Tribe, Inc. v. Dep’t of Game, 433 U.S. 165, 171-72, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). At its most expansive, tribal sovereign immunity may extend to tribal officers—but only when such officers are acting within the legitimate scope of their official capacity. See Tamiami Partners v. Miccosukee Tribe of Indians, 177 F.3d 1212, 1225 & n. 16 (11th Cir.1999) (Tamiami III) (collecting cases); but cf. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 59, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (holding that “[a]s an officer of the [Indian tribe], petitioner .is not protected by the tribe’s immunity from suit”).
Whatever the scope of a tribal officer’s official capacity, it does not encompass activities that range beyond the authority that a tribe may bestow. See Tamiami III, 177 F.3d at 1225; Tamiami II, 63 F.3d at 1045, 1050-51. It follows from this tenet that because the Tribe is legally obligated to comply with the State’s cigarette tax scheme, see supra note 3, violations of that scheme by the Tribe’s officers fall outside the scope of their official capacity. Therefore, the arrests of the Tribe’s officers involved in the smoke shop operation would be valid regardless of the scope of the Tribe’s sovereign immunity.
III. CONCLUSION
In the final analysis, the J-Mem and the Settlement Act dictate the result we reach. Under their terms, the Tribe surrendered any right to operate the settlement lands as an autonomous enclave. It is plainly not the case, as the Tribe would have it, that an Indian tribe can render any conceivable act on Indian lands (say, drug trafficking) impervious to state regulation by the simple expedient of labeling it “tribal.” That is emphatically true with respect to the Tribe’s activities on the settlement lands.
In sum, the Tribe remains as free as ever to operate the smoke shop; it simply must comply with state law in the process. That result is not disquieting: after all, no principle of federal law or tribal self-governance authorizes Indian tribes “to market an exemption from state taxation to persons who would normally do their business elsewhere.” Colville, 447 U.S. at 155, 100 S.Ct. 2069. The Tribe has not explained *31 how being subject to the enforcement of the State’s cigarette tax scheme is an infringement on its retained sovereignty when being subject to the requirements of the scheme is not.
Consistent with the foregoing, we hold, first, that the J-Mem and the Settlement Act authorized state officers to enter the settlement lands and execute a search warrant as part of the enforcement of the State’s cigarette tax scheme. Second, in light of the unique historical and legal context in which this ease arises—and, particularly, the provisions of the J-Mem and the Settlement Act—we conclude that the Tribe’s sovereign immunity neither prohibited the State from executing that warrant against the Tribe nor barred it from arresting tribal officers and members for activities incident to the operation of the smoke shop. Consequently, the State’s actions here—its entry into the settlement lands, its seizure of the Tribe’s inventory of unstamped, untaxed cigarettes, and the accompanying arrests— were lawful.
In arriving at these conclusions, we do not diminish the dignity and respect that should be afforded the Tribe as a sovereign entity. Nor do we imply that dragnet arrests and police raids on the settlement lands should be the State’s preférred method for enforcing the Tribe’s obligation to comply with state law. We recognize, however, that the Tribe and the State negotiated a carefully calibrated agreement between sovereigns, memorialized that agreement in the J-Mem, and sealed the deal by obtaining Congress’s imprimatur. It is not for the courts to rewrite the terms of that arrangement.

The district court’s order granting the appellees’ motion for summary judgment and denying the appellant’s motion for summary judgment is a ffirmed.

. The named defendants include various Rhode Island state officials, the Town of Charlestown, and the Charlestown Police De~ partment. Because the central dispute is between the Tribe and the State, we address if in those terms.

. The statutory scheme does exempt the settlement lands from state hunting and fishing regulations, see 25 U.S.C. § 1706(a)(3), but that exemption is of no consequence here.

. In granting rehearing en banc, we chose not to revisit this point. That choice left intact the panel's holding that the Tribe must comply with the cigarette tax scheme when it sells cigarettes on the settlement lands. That holding has, therefore, become the law of the case. See United States v. Moran, 393 F.3d 1, 7 (1st Cir.2004) (stating that "a legal decision made at one stage of a ... civil proceeding should remain the law of that case throughout the litigation, unless and until the decision is modified or overruled by a higher court”).

. In his separate dissent. Judge Torruella argues that this second question is not properly *22 before the en banc court under the law of the case doctrine. See post at 41 n. 18 (Torruella, J., dissenting). This argument mischaracter-izes the unrevoked portion of the panel opinion, which concludes only that the Settlement Act did not effectuate a “wholesale abrogation of the Tribe's sovereign immunity.” Op. at 27 (emphasis supplied). This statement leaves ample room for us to examine the dimensions of the Tribe’s sovereign immunity vis-á-vis the settlement lands. In all events, the order granting rehearing en banc, quoted supra, indisputably opened the sovereign immunity question to our consideration.

. The Tribe notes that the Maine Indian Claims Settlement Act, which was passed some years after the statute at issue here, includes a more explicit abrogation of tribal sovereign immunity. See 25 U.S.C. § 1725(d). From this, the Tribe argues that Congress’s failure to be similarly explicit in section 1708(a) heralds an intent not to cancel out the Tribe's sovereign immunity. In our view, the particulars of the Maine Act have little bearing here. Cf. Akins v. Penobscot Nation, 130 F.3d 482, 484 & n. 2 (1st Cir. 1997) (remarking the uniqueness of the “structure of analysis” under the Maine Act and distinguishing it from the Rhode Island Settlement Act). That is particularly so given the idiosyncratic circumstances surrounding the execution of the J-Mem and the subsequent enactment of section 1708(a).

. In fact, Public Law 280 originally authorized states to assume civil and criminal adjudicatory jurisdiction over Indian country without first securing tribal consent. Pub.L. No. 83-280, § 7, 67 Stat. 588, 590 (1953). Congress subsequently amended the law to require such consent as a precondition to the extension of state jurisdiction over tribal lands. See 25 U.S.C. §§ 1321-1322; see also Bryan, 426 U.S. at 386, 96 S.Ct. 2102.

. The Supreme Court cases cited by the dissenters in support of the “force and effect" argument involve Public Law 280’s civil jurisdiction provision and operate against the general rule of tribal sovereign immunity from civil suit. See Three Affiliated Tribes, 476 U.S. at 890-91, 106 S.Ct. 2305; Puyallup Tribe, Inc. v. Dep't of Game, 433 U.S. 165, 170-73, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977); Bryan, 426 U.S. at 389, 96 S.Ct. 2102. To our knowledge, the Supreme Court has not addressed whether sovereign immunity ordinarily insulates an Indian tribe from state criminal process or whether Public Law 280's criminal jurisdiction provision places any limitation on tribal sovereign immunity.

. The Tribe's reliance on the unpublished opinion in Narragansett Tribe v. Guilbert, 989 F.2d 484 (1st Cir. 1993) (table), is equally misplaced. That case, like Maynard, involved the Tribe’s immunity from a civil suit (in the form of a counterclaim for money damages) for activities occurring outside the settlement lands. In all events, the opinion has no prec-edential force. See 1st Cir. R. 32.3,

. The Tribe's citation to United States v. James, 980 F.2d 1314, 1319 (9th Cir. 1992), in which the Ninth Circuit ruled that tribal sovereign immunity bars a federal court from issuing a subpoena duces tecum against a non-party tribe, suffers from the same infirmities.